[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 14, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-10030

_____

D. C. Docket No. 99-00528-CV-JAL

ELSA CABELLO,
ZITA CABELLO-BARRUETO, et al.

Plaintiffs-Appellees,

versus

ARMANDO FERNÁNDEZ-LARIOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 14, 2005)**

Before ANDERSON and WILSON, Circuit Judges, and OWENS*, District Judge.

_____

*Honorable Wilbur D. Owens, Jr., United States District Judge for the Middle District of
Georgia, sitting by designation.

PER CURIAM:

Winston Cabello (Cabello), a Chilean economist, was executed by Chilean military officers following a *coup d'état*, on October 17, 1973. On February 19, 1999, almost twenty-six years later, his survivors filed an action in district court against Armando Fernandez-Larios (Fernandez), a Chilean military officer who was alleged to have participated in his execution. The lawsuit was filed pursuant to the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350 (1991), and the Tort Victims Protection Act (TVPA), 28 U.S.C. § 1350 note (1991). Cabello's survivors alleged that Fernandez participated in Cabello's extra-judicial killing, torture, crimes against humanity, and cruel, inhuman or degrading punishment. The case proceeded to a jury trial and resulted in a verdict in favor of the Cabello survivors and an award of $3 million dollars in compensatory damages and $1 million dollars in punitive damages. Fernandez appeals contending: (1) that the Cabello survivors' claims are barred by the statute of limitations; (2) that neither the TVPA, nor the ATCA provide private causes of action such as this one; (3) that he did not have any command responsibility and did not personally participate in the alleged human rights violations, and, as a result, he is not liable under the TVPA or the ATCA; (4) that the trial court erred in admitting certain depositions into evidence and denying his pretrial motion in limine to restrict evidence as to the

2

treatment of Cabello.  Finding no error, we affirm.

I. Factual Background

On September 11, 1973, President Allende was ousted in a *coup d'état* by Chilean military officers led by General Augusto Pinochet who began operating a military *junta*.  Following the *coup*, Cabello was arrested and incarcerated in the Copiapó jail.  Within a few weeks, he was transferred to the Copiapó military garrison.  Cabello had worked as an economist appointed by the government of President Salvador Allende to serve as Director of the Regional Planning Office for the Atacarna-Coquimbo region in Copiapó, Chile.

In early October 1973, General Arellano Stark's unit embarked upon the "Caravan of Death."  The unit traveled to many cities in northern Chile where the military officers engaged in acts of extrajudicial killing, torture, and abuse of various individuals who were incarcerated due to their alleged opposition to the military *junta*.  Fernández traveled with the "Caravan of Death" to several cities, including Copiapó, and served as bodyguard to General Arellano.

On October 16, 1973, Fernández and five other members of General Arellano's squad arrived at the Copiapó military garrison.  They instructed local military officers to provide them with the prisoners' files from which the squad selected thirteen prisoners, Cabello included, for execution.  In the early morning

3

hours of October 17, 1973, Fernández, the rest of General Stark's unit, and two additional military officers drove the thirteen prisoners ten minutes outside of Copiapó toward the City of La Serena, ordered the prisoners out of the truck, and executed each by gunfire or by stabbing. Cabello refused to leave the truck and was stabbed to death by Fernández who slashed Cabello with a *corvo*, a short, curved knife that is designed to inflict fatal wounds while causing a prolonged and painful death.

On October 18, 1973, the local Copiapó newspaper published a *bando*, an official statement of the Chilean government, falsely indicating that thirteen political prisoners had been killed while attempting to escape during a transfer from detention in Copiapó to the La Serena prison. Shortly after Cabello's death in 1973, his family received a death certificate indicating that he was executed by the Chilean military. In 1985, Cabello's family received a revised death certificate indicating that the cause of death was a gunshot wound.

Once the civilian government under the leadership of President Patricio Aylwin replaced General Pinochet's military regime in 1990, the Chilean government began granting requests to exhume the bodies of the thirteen political prisoners killed on October 17, 1973. These exhumations revealed that many of the victims were slashed with *corvos*, but did not indicate whether this was done

4

during an attempted escape. In 1991, Cabello's family received a third and final death certificate lacking reference to the cause of death.

Between 1973 and 1990, Chilean military officials deliberately concealed Cabello's burial location from his family. In 1978, the Chilean military government extended amnesty to the perpetrators and accomplices of criminal acts committed between September 11, 1973 and March 10, 1978. On August 24, 1990, the Chilean Supreme Court extended that decree of amnesty to human rights violations committed by the military during the previous years. Cabello's estate brought this action in district court on February 19, 1999.

Fernández resigned from the Chilean military in January 1987, by which time he had received the rank of Major. At the time of his resignation, Fernández publicly admitted that he was a member of General Arellano's squad when Cabello was executed. He secretly entered the United States and lived in an undisclosed location under the protection of the United States Government. In February 1987, Fernández pled guilty to being an "accessory after the fact" to the 1976 car bombing in Washington, D.C., that killed the former Chilean ambassador to the United States and his assistant.[1]

---

[1] Fernández currently lives in Miami. The terms of his plea agreement for the assassination attempt prevent him from returning to Chile. As a result, he is the only member of the Chilean military subject to personal jurisdiction in the United States. The district court excluded this evidence as prejudicial and not probative of any material fact at issue since he did

5

II. Discussion

A. Equitable Tolling

We first decide whether the Cabello survivors' claims were time-barred or whether the applicable statute of limitations was equitably tolled. The question of whether equitable tolling applies is a legal one subject to *de novo* review. *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1531 (11th Cir. 1992). We are, however, bound by the trial court's findings of fact unless they are clearly erroneous. *Id*.

Fernández initially argues that the TVPA's ten-year statute of limitations cannot be extended to the ATCA. We readily dispense with that issue. It is clear that "[t]he ATCA and the TVPA share the same ten-year statute of limitations." *Arce, et al. v. Garcia*, 11th Cir. 2005,___F.3d.___,___ (No. 02-14427, February 28, 2005). This ten-year statute of limitations is applicable to the Cabello survivor's claims.

1. Retroactivity

Fernández additionally argues that even if the TVPA's statute of limitations applies to the ATCA, its application is inappropriate in this case because such retroactive application will revive a cause of action that would have been barred at

not join the group responsible for the ambassador's attempted assassination until after Cabello was killed in Copiapó.

6

the time the TVPA was enacted. The Cabello survivors argue that because the TVPA does not increase liability for past conduct, it should be applied retroactively.

The Supreme Court has "frequently noted . . . that there is a presumption against retroactive legislation [that] is deeply rooted in our jurisprudence [and] [t]he principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 117 S. Ct. 1871, 1876 (1997) (alterations in original) (citations omitted). However, the TVPA could apply retroactively if we find that Congress has clearly indicated its intent to do so. *Id*. The Supreme Court has created a three-part analysis to determine retroactivity. *Id*. First, we must examine "whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S. Ct. 1483, 1505 (1994). When Congress does not expressly address the issue of retroactivity in the statute, as with the TVPA, then we employ normal rules of statutory construction to ascertain the temporal scope of the statute. *Craig v. Eberly*, 164 F.3d 490, 494 (10th Cir. 1998) (internal citations omitted). Third, if the statute's temporal scope cannot be determined by means of normal statutory interpretation methods, then we must consider whether the statute has a

retroactive effect. *Lindh v. Murphy*, 521 U.S. 320, 325-26, 117 S. Ct. 2059, 2062-63 (1997).

When Congress enacts a new statute without expressly prescribing the statutes' proper reach, the courts must determine whether the new statute has retroactive effect to events that took place prior to the enactment of the statute. The Supreme Court has said that retroactive effect is impermissible if the statute would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Landgraf,* 511 U.S. at 280, 114 S. Ct. at 1505 (internal citations omitted).

The TVPA creates no new liabilities nor does it impair rights. Rather, the TVPA extended the ATCA, which had been limited to aliens, to allow citizens of the United States to bring suits for torture and extrajudicial killings in United States courts. *See* H.R. Rep. No. 102-367, at 3 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 86. Additionally, other international agreements imposed liability for torture, killing, and mistreatment at the time of Fernández's alleged actions. *See e.g.*, Universal Declaration of Human Rights, U.N. General Assembly Res. 217 (III)(A) (1948); International Covenant on Civil and Political Rights, U.N. General Assembly Res. 2200 (XXI)A, U.N. Doc. A/6316 (1966); European

Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, European Treaty Series No. 5 (1968). Therefore, prior to the TVPA, this Court could have exercised extraterritorial jurisdiction to reach wrongful death actions involving defendants and locations outside the forum jurisdiction. *See, e.g., Alvarez-Machain v. United States*, 107 F.3d 696, 703 (9th Cir. 1996). Further, as the district court correctly noted, torture, crimes against humanity, and cruel, inhumane, or degrading punishment have been a part of the United States and international law long before Fernández's alleged actions. *Cabello Barrueto v. Fernández Larios*, 205 F. Supp. 2d 1325, 1331 (S.D. Fla. 2002). Because the TVPA does not increase Fernández's liability or impair any of his rights, the Act does not create an impermissible retroactive effect if applied to his pre-TVPA actions.

2. The Appropriateness of Equitable Tolling

Fernández argues that the Cabello survivors' claims are time-barred because the prisoners were killed in 1973 and the Cabello survivors first filed their complaint in 1999. The district court recognized that the statute of limitations did not begin to run until 1990 when the bodies of the thirteen prisoners killed at Copiapó were located and exhumed, which occurred only after General Pinochet left office. Thus, the district court reasoned that the Cabello survivors' claims

9

were not time-barred because the TVPA's ten-year statute was equitably tolled.

Our precedent has established that the TVPA's and ATCA's statute of limitations can be equitably tolled. *See Arce* at *11. We must therefore determine whether the facts of this case demonstrate "extraordinary circumstances" sufficient for equitable tolling. *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). This is a fact-specific determination because a finding of "extraordinary circumstances [necessary for equitable tolling] is reserved for extraordinary facts." *See Arce* at *23 (internal quotations omitted).

As we held in *Justice*, equitable tolling is appropriate in situations where the defendant misleads the plaintiff, allowing the statutory period to lapse; or when the plaintiff has no reasonable way of discovering the wrong perpetrated against her, as is the case here. 6 F.3d at 1479. Additionally, in order to apply equitable tolling, "courts usually require some affirmative misconduct, such as deliberate concealment." *Arce* at *16.

*Arce*, our only case addressing the application of equitable tolling to claims brought under the ATCA and the TVPA, illustrates the proper analysis. In that case, "Salvadoran refugees...claim[ed] that they were tortured by soldiers in El Salvador during the course of a campaign of human-rights violations by the Salvadoran military from 1979 to 1983." *See id*. at *2. The plaintiffs claimed that

10

an on-going civil war in El Salvador and defendants' pattern of denial about their personal responsibility for human rights abuses in El Salvador prevented them from timely filing their claims. *Id*. at \*14-\*16. We found these arguments insufficient to equitably toll the statute of limitations, stating that "[e]quitable tolling is appropriate only in "extraordinary circumstances [such as those] that are both beyond the plaintiff's control and unavoidable even with diligence. *Id*. at \*11.

The instant case is distinguishable from *Arce* on its facts. The district court determined that the Cabello survivors knew that Cabello was killed in October 1973 and that unknown military officers were involved. However, it was not until 1990 that they obtained knowledge of Cabello's manner of death and information about the harm suffered by him before his death. Until Cabello's unmarked grave was located, his family did not know that he and the other prisoners had been tortured before being massacred. Although Victor Bravo, a local official called upon by the military authorities to identify the bodies of the dead, had seen the prisoners' bodies shortly after they were killed, he never spoke of their conditions to the families.

The Chilean government, with whom Fernández conspired, concealed both the manner in which Cabello died and his place of burial. The Chilean government

11

also created great confusion by sending three conflicting death certificates to the Cabello family. Until the first post-*junta* civilian president was elected in 1990, the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder. The district court decided that Cabello's family could not possibly have pursued their claims until Cabello's body was exhumed.

We agree with the district court's conclusion that the cover-up of the events surrounding Cabello's death made it nearly impossible for the Cabello survivors to discover the wrongs perpetrated against Cabello. As a result of this deliberate concealment by Chilean authorities, equitable tolling is appropriate in this case.

### 3. Date Statute of Limitations Began to Run

Though we have determined that the TVPA was equitably tolled, the inquiry does not end there. We must establish when exactly the ten-year statute of limitations began to run. The Seventh Circuit addressed this issue and in so doing, distinguished equitable tolling and equitable estoppel. The court opined that "a plaintiff who invokes equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 453 (7th Cir. 1990). By contrast, when a plaintiff is entitled to equitable

estoppel, the clock stops upon the tolling of the limitations period and begins again when the impediment to bringing suit is removed.

As we stated in *Justice*, the plaintiff should act with due diligence and file his or her action in a timely fashion in order for equitable tolling to apply. 6 F.3d at 1479. The information regarding the circumstances and manner of Cabello's death was not discoverable or knowable until 1990; therefore, the 1999 filing of this claim was timely.

Our Circuit's precedent indicates that the statutory clock is stopped while tolling is in effect. In *Knight v. Schofield* we addressed the statute of limitations question in the habeas context. There we held that "tolling means just what it says – the clock is stopped while tolling is in effect." 292 F.3d 709, 712 (11th Cir. 2002). Although this holding addressed equitable tolling of the Antiterrorism and Effective Death Penalty Act, we find that it is equally applicable in the context of other statutes. When a statute is equitably tolled, the statutory period does not begin to run until the impediment to filing a cause of action is removed. Thus, in this case, the clock was stopped until 1990 when the information surrounding Cabello's death became available. Since the statutory period began to run in 1990, the Cabello survivors' claim filed in 1999 is timely.

Accordingly, we affirm the ruling of the district court and hold that the

Cabello survivors' claims were not time-barred because they were entitled to equitable tolling of the ten-year statute of limitations.

B. Fernandez's Liability for Cabello's Death

In addition to Fernández's argument that the Cabello survivors' claims are time-barred, he claims that there is no valid cause of action under either the ATCA or the TVPA. Further, Fernández contends that, even if we find that the ATCA and the TVPA create private causes of action, he cannot be held liable for Cabello's death because he was not present and had no direct involvement in the killing.[2]

Renewed motions for judgment as a matter of law test the sufficiency of the evidence supporting a jury's verdict; we review such motions *de novo* and use the same standard as the district court. *See Hessen v. Jaguar Cars, Inc.*, 915 F.2d 641, 644 (11th Cir. 1990).

1. Cause of Action under the ATCA and TVPA

Fernández, citing *Ford ex rel. v. Garcia*, initially argues that the Cabello survivors cannot bring a TVPA cause of action because he had no command

---

[2] Fernández also argues that he is not liable because he was merely present at the scene of the crime. Because the evidence shows that Fernández was engaged in affirmative acts that contributed to Cabello's death, Fernández's "mere presence" argument lacks merit. *See Jacobs v. Singletary,* 952 F.2d 1282, 1290-91 (11th Cir. 1992) (Defendant was indicted for being one of several people involved in a shooting but it was not known who fired shots. Jury was properly given aiding and abetting instruction, not instruction regarding mere presence.)

responsibility. 289 F.3d 1283 (11th Cir. 2002), *cert. denied*, 537 U.S. 1147, 123 S. Ct. 868 (2003). This is not a correct reading of *Ford*. In *Ford*, survivors of churchwomen who had been tortured and murdered in El Salvador brought an action under the TVPA, pursuant to the command responsibility doctrine, against former Salvadoran officials. *Id*. We held that the district court did not err when it instructed a jury that plaintiffs were required to show that guardsmen were under the effective control of defendant officials. *See Id*. at 1290. This holding contemplates that the Cabello survivors may bring an action under the TVPA pursuant to the command responsibility doctrine, however, it does not limit actions brought under the TVPA to this command responsibility theory as Fernández claims. Thus, although Fernández had no command responsibility of actions that led to Cabello's death, the TVPA still provides a cause of action.

Fernández further states that the ATCA creates no private cause of action to enforce international law norms. He argues that the ATCA does not provide the Cabello survivors with a forum because they fail to identify any international authority imposing liability upon a soldier who lacked any command authority. Accordingly, Fernández argues that the ATCA does not create a private cause of action that extends liability down the chain of command to a subordinate officer. Additionally, he states, that there was no viable claim because the Cabello

15

survivors failed to show that Fernández (1) either personally killed or tortured Cabello or ordered his killing; (2) that as a junior military officer in the Chilean military, he was merely acting as instructed by his superiors; and (3) that the killing was carried out by his superiors and thus, that he is not liable. [3]

We have not addressed whether claims based on indirect liability are actionable under the ATCA and the TVPA. However, by their terms, the ATCA and the TVPA are not limited to claims of direct liability. The courts that have addressed the issue have held that the ATCA reaches conspiracies and accomplice liability. *See e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 776-77 (9th Cir. 1996); *Carmichael v. United Tech Corp.*, 835 F.2d 109, 113-14 (5th Cir. 1988).

An examination of legislative history indicates that the TVPA was intended to reach beyond the person who actually committed the acts, to those ordering, abetting, or assisting in the violation. *See* S. Rep. No. 102-249, at 8-9 (1991). The Senate Report relies on several international agreements that contemplate liability under international norms for indirect responsibility. For instance, "Article 4(1) of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment provides: 'Each State Party shall ensure that

---

[3] Although Fernández argues that he cannot be secondarily liable because he was a military subordinate acting under the command of his superiors, military law provides that he can still be found liable. *See, e.g.*, *United States v. Jaks*, 28 M.J. 908 (1989) (where the evidence indicates that a junior officer was more than merely present and instead acted to further the conspirator's objectives, he may be liable even if his co-conspirators were his military superiors)

16

all acts of torture are offenses under its criminal law.  The same shall apply to an attempt to commit torture and to an act by any person which constitutes complicity or participation in the torture.'"  *Id* at 9 n.16.  Also, "Article 3 of the Inter-American Convention to Prevent and Punish Torture similarly provides: 'The following shall be held guilty of the crime of torture: (a) A public servant or employee who, acting in that capacity, orders, instigates or induces the use of torture, or directly commits it or who, being able to prevent it, fails to do so'."  *Id* at 9 n.16.  Additionally, other courts have held that where a defendant has been found directly or secondarily responsible for acts of torture or extrajudicial killing, the acts are in violation of the law of nations within the meaning of the TVPA and ATCA.  *See, e.g.*, *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 99-100 (D.D.C. 2003); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1355-56 (N.D. Ga. 2002).  Because the TVPA and the ATCA permit claims based on direct and indirect theories of liability, the jury's general verdict may be upheld if sufficient evidence supports either theory.

### 2. Sufficiency of the Evidence

The jury was instructed that it could find Fernández liable only if he "actively participated" in the offenses.  The jury was told to consider whether he directly participated in the offenses or whether he participated as a conspirator or

17

as an aider or abettor.  Fernández argues that the jury verdict should be reversed because their decision was unsupported by the evidence.

### a. Direct Liability

We turn to the evidence to consider whether it is sufficient to support the jury's general verdict.  The trial testimony includes evidence that while Fernández was in Copiapó, Patricio Barruet, one of Cabello's fellow prisoners, was awakened by an unidentified person who woke Cabello and escorted him from his room. Cabello was killed that night.  According to Victor Bravo Cabello was among the dead.  Bravo's testimony indicates that Cabello had cuts on his ear and a gaping wound running from his ear to throat.  Fernández admitted that he had the only *corvo* in Copiapó and had not loaned it to anyone.  Dr. Elvira Miranda, who examined Cabello's body after the exhumation, found tears in his clothing and blood stains consistent with knife wounds that could have been caused by a *corvo*. Although the evidence supporting direct liability is not as strong as that supporting indirect liability, as discussed below, we find that a jury could reasonably have concluded from this circumstantial evidence that Fernández was directly liable for Cabello's torture or death.  We need not focus on direct liability, however, because overwhelming substantial evidence supports a finding of indirect liability.

### b. Indirect Liability

18

Fernández can be found indirectly liable for Cabello's death on two different theories: (1) aiding and abetting or (2) conspiracy. The district court instructed the jury that to find Fernández indirectly liable for aiding and abetting, the Cabello survivors needed to prove "active participation" by preponderance of the evidence. In assessing "active participation," the jury was instructed to consider if (1) one or more of the wrongful acts that comprise the claim were committed, (2) Fernández substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim, and (3) Fernández knew that his actions would assist in the illegal or wrongful activity at the time he provided the assistance.

From the physical evidence described above and from historical context, the jury reasonably could have concluded that a wrongful act of the type alleged actually occurred. Cabello's wounds comport with other politically motivated killings during Pinochet's *coup*, such that a jury could reasonably conclude that Cabello was the victim of a crime against humanity, mistreatment, torture, or extrajudicial killing.

Fernández's substantial assistance in Cabello's killing, torture, or mistreatment is adequately supported by the evidence. The jury could reasonably conclude that Fernández was indirectly liable based on Fernández's admission that

19

he served as Arellano's bodyguard. According to the deposition of Enrique Vidal Aller ("Vidal"), an aide to the garrison's commander, Fernández bragged that he was Arellano's right hand man and that his spiked weapon would be used to "caress the little pigeons," which Vidal understood as a threat to the prisoners. Vidal also saw Fernández enter the office in which prisoner's files were kept. Dr. Ivan Murua Chevesich ("Murua"), a prisoner who was being interrogated in that office, testified that he saw Fernández with Arellano when Arellano selected files of prisoners and said that they would be "eliminated." Murua also testified that those files were marked with red circles. Another witness saw Fernández himself selecting and reviewing prisoners' files.

Moreover, the statements attributed to Fernández reflect his knowledge that he was assisting in wrongful activity. Aside from those statements described above, Vidal testified that Fernández told him that "you will soon find out" why his squad was in Copiapó. Fernández was also present when Arellano stated that certain prisoners would be eliminated.

From these facts, the jury could have reasonably concluded that Fernández aided and abetted in Cabello's killing. Because there is sufficient evidence to support a finding of aiding and abetting, the jury's general verdict should stand.

The second theory on which Fernández could be found indirectly liable is

20

that of conspiracy. For the jury to find Fernández indirectly liable by means of conspiracy, the Cabello survivors needed to prove by a preponderance of the evidence that (1) two or more persons agreed to commit a wrongful act, (2) Fernández joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy. *See Halberstam v. Welch*, 705 F.2d 472, 481, 487 (11th Cir. 1983).

For proof of the first required criterion, agreement, the jury was presented with evidence of a common plan – that the officers at Copiapó were in accord that their goal was to kill prisoners there. Considering the evidence of a plan, in addition to Fernandez's comments (such as saying that he was Arellano's right hand man and that his spiked weapon would be used to "caress the little pigeons"), Arellano's comments (such as saying that prisoners would be "eliminated"), and Fernández's involvement with killings before and after Copiapó, the evidence of an agreement to commit wrongful acts was sufficient.

Evidence at trial also indicated that before Fernández reached Copiapó, his squad had killed fifteen prisoners in La Serena. As described above, the jury heard evidence that one of the squad's objectives was to kill the civilian prisoners whose

21

files were selected by Arellano, likely with the aid of Fernández. Evidence also showed that following the events alleged in this action, Fernández's squad participated in the killing of more civilians in Antofagasta and Calama. A jury could reasonably conclude that, at the very least, it was foreseeable to Fernández that Cabello would be tortured and killed by his co-conspirators at Copiapó. Another reasonable inference from the evidence is that Fernández had actual knowledge that members of the conspiracy were going to kill Cabello. Thus, the evidence presented was sufficient to show that Fernández joined the conspiracy with knowledge of the conspiracy's plan and with the intent of helping to accomplish those goals.

Further, it is undisputed that Fernández's military colleagues, if not Fernández himself, were responsible for Cabello's death. Because killing civilians presumably opposed to the *junta* is an act in furtherance of the conspiracy, the jury reasonably could have found the third and final element had been satisfied.

The trial evidence is sufficient to support the general jury verdict based on any of the possible theories of liability. Since we are bound to uphold the general verdict if we find any of the theories of liability supported by sufficient evidence, the jury's general verdict must stand.

C. Admissibility of Depositions

22

Fernández also appeals the district court's allowance of several depositions into evidence. We review evidentiary rulings of the district court for abuse of discretion. *See Palmer v. Bd. of Regents*, 208 F.3d 969, 973 (11th Cir. 2000).

At trial, both parties presented videotaped excerpts of the sworn and transcribed deposition testimony of six Chilean witnesses. These witnesses were Chilean nationals residing in Chile and were deposed in Chile. Each witness gave personal accounts of the atrocities in which Fernández participated.

Fernández argues that these depositions considered by the jury were improperly admitted because they did not comply with the oath provision of Federal Rule of Procedure 28(b). Subsection (b)(3) of the rule provides that a deposition may be taken "on notice before a person authorized to administer oaths in the place where the examination is held, either by the law thereof or by the law of the United States." Fed. R. Civ. P. 28(b)(3).

The Cabello survivors respond that Fernández waived his objections, starting with the fourth deposition. At the commencement of the fourth deposition, the Cabello survivors responded to Fernández's previous objections by offering to procure a Chilean notary authorized to administer oaths under Chilean law. Because Fernández's counsel declined this offer, the Cabello survivors argue that Fernández constructively waived his objection to technical error, citing Federal

23

Rule of Civil Procedure 32(d)(3)(B).

Rule 32(d)(3)(B) provides in relevant part: "[e]rrors and irregularities occurring at the oral examination . . . in the oath or affirmation . . . and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made *at the taking of the deposition*." (emphasis added). The rules distinguish objections to the manner of taking the deposition from objections as to the substance of the testimony (such as relevancy or competency) because allowing counsel to wait until trial to object might encourage sandbagging. *See, e.g., Kirschner v. Broadhead*, 671 F.2d 1034, 1037-38 (7th Cir. 1982); *Bahamas Agric. Indus., Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1180-81 (6th Cir. 1975).

Because the defect in the oath could have been cured at the taking of the deposition, Fernández's counsel's refusal to accept the cure constituted a constructive waiver. The facts of this case fall within the purview of Rule 32(d)(3)(B). Thus, even though Fernández objected at trial, his failure to object at the taking of the deposition was correctly deemed a waiver. The district court was well within its discretion in admitting the contested depositions into evidence. We accordingly affirm the district court's ruling on this issue.

D. Admissibility of Acts Committed Against Cabello

Before trial, Fernández moved to exclude all evidence except the "proof . . . about what interaction he had with Winston Cabello in Copiapó" contending that "[n]one of the evidence about events outside Copiapó is relevant." Fernández claimed that the evidence of mistreatment of other prisoners was unfairly prejudicial to him. We review the district court's decision to grant or to deny a motion in limine for abuse of discretion. *See Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1503 (11th Cir. 1985). The district court has wide discretion in determining the relevance of evidence produced at trial. *See United States v. Kopituk*, 690 F.2d 1289, 1319 (11th Cir. 1982).

The district court found that evidence concerning the other twelve victims in Copiapó and the killings at the cities visited before and after Copiapó was relevant to whether Fernández knowingly participated in crimes against humanity and to whether he conspired to commit or aided and abetted the commission of other offenses. We agree.

As the Cabello survivors correctly argue, the evidence established a conspiracy in which Fernández's squad participated in the killing of at least 72 civilians, including those in Copiapó. The admitted evidence showed that Fernández was personally responsible for killings in La Serena, just prior to the incidents in Copiapó and also for acts in Antofagasta and Calama. Further,

25

Cabello was one of thirteen men killed and buried together in Copiapó. We find no abuse of discretion in the trial judge's ruling that the evidence relating to the deaths' of the other prisoners is materially relevant in establishing the theory of conspiracy.

To prove the claim of crimes against humanity, the Cabello survivors had to prove a widespread or systematic attack directed against any civilian population. Additionally, to prove conspiracy or aiding and abetting, at trial, the Cabello survivors were required to prove that Fernández had knowledge of the death squad's illicit purpose. Fernández's treatment of other prisoners and his participation in the squad's activities elsewhere are directly relevant to this question of liability for both the claims of conspiracy and that of aiding and abetting.

The evidence relating to the mistreatment or killing of other prisoners is not only relevant, but essential for the Cabello survivors' claims of crimes against humanity and that of conspiracy. Because this evidence was relevant and essential and the district court had no reason to believe that it would unfairly prejudice the defendant, admitting the evidence was within its discretion.

III. Conclusion

Upon consideration of the record and the parties' briefs and oral arguments,

we agree with the rulings of the district court.  We therefore affirm the district court's rulings as to all four issues before us.

**AFFIRMED**.

ANDERSON, Circuit Judge:

I concur in the result.