[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 04-10234
_____

D. C. Docket No. 01-03399-CV-FAM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 8, 2005
THOMAS K. KAHN
CLERK

ANGEL ENRIQUE VILLEDA ALDANA,
JORGE AUGUSTIN PALMA ROMERO,
OSCAR LEONEL GUERRA EVANS,
LYIONHEL MCINTOSH RODRIGUEZ,
MAREL MARTINEZ,
GUMERZINDO LOYO MARTINEZ,
RIGOBERTO ALVAYERO HERNANDEZ,

Plaintiffs-Appellants,

versus

DEL MONTE FRESH PRODUCE, N.A., INC.,
BANDEGUA, Compania De Desarrollo De Guatemala,
FRESH DEL MONTE PRODUCE, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 8, 2005)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and RESTANI[*],
Judge.

PER CURIAM

_____

[*]Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting
by designation

Plaintiffs-Appellants ("Plaintiffs") filed a twelve-count complaint against

Defendant-Appellee ("Del Monte") in the United States District Court for the

Southern District of Florida. The complaint alleged violations of federal and state

laws.[1] The district court granted Del Monte's motion to dismiss for failure to state

a claim on the federal law claims, and it dismissed the remaining state law claims

for lack of jurisdiction. We affirm in part, vacate in part and remand.


**BACKGROUND**


Because the district court granted Del Monte's motion to dismiss, the facts

are taken from the well pleaded allegations of the complaint. Chepstow Ltd. v.

Hunt, 381 F.3d 1077, 1080 (11th Cir. 2004) (citations omitted). Plaintiffs are

seven Guatemalan citizens currently residing in the United States. Del Monte is a

Delaware company; its principal place of business is in Coral Gables, Florida. In

---

[1] When we refer to the "complaint," we mean the third amended complaint filed by Plaintiffs on 5 February 2003. The thirty-one page, one-hundred-and-four paragraph complaint is attached as an appendix to this opinion. By the way, the order upon which this appeal is based, is an order dismissing Plaintiffs' complaint without prejudice: the district court allowed Plaintiffs a stated time in which to amend their complaint again. Aldana v. Fresh Del Monte Produce, Inc., 305 F. Supp.2d 1285, 1308 (S.D. Fla. 2003). Plaintiffs chose to appeal instead of amending the complaint a fourth time. Because Plaintiffs filed their notice of appeal before the time to amend expired, they waived the right to amend later the complaint; and the dismissal became final for appeal purposes. Schuurman v. Motor Vessel "Betty K V", 798 F.2d 442, 445 (11th Cir. 1986).

Guatemala, Plaintiffs were officers in SITRABI, a national trade union of plantation workers. At the time in question, they represented workers on a Bandegua banana plantation in the municipality of Morales, Izabal. Bandeuga is a wholly-owned subsidiary of Del Monte.

SITRABI and Bandegua were negotiating a new collective bargaining agreement for workers at the plantation. While those negotiations were ongoing, Bandegua terminated 918 workers. SITRABI responded by filing a complaint in the Labor Court of Guatemala. Negotiations continued.

Plaintiffs allege that on or before 13 October 1999, Bandegua hired or established an agency relationship with a private, armed security force. Private security forces are permitted and regulated in Guatemala. According to Plaintiffs, on 13 October 1999, Del Monte agents met with the security force "to plan violent action against the Plaintiffs and other SITRABI leaders." Plaintiffs do not allege that government officials attended the meeting.

According to Plaintiffs, at 5:45 p.m. the security force, which is described as "a gang of over 200 heavily armed men," arrived at SITRABI's headquarters in Morales, Izabal. There, the security force held two Plaintiffs hostage, threatened to kill them, and shoved them with guns. Throughout the evening, other SITRABI leaders were lured, abducted or otherwise forced to the headquarters and similarly

3

detained.[2]  Once the seven SITRABI leaders were in the headquarters, "a leader of the security force . . . who claimed to be the President of the [municipal] Chamber of Commerce," blamed Plaintiffs for the area's economic decline.  The official also explained that Plaintiffs' union activity could cause Del Monte to abandon the plantation.  Later, a mayoral candidate appeared.  While the candidate was at SITRABI headquarters, the security force "reached a consensus that the two main leaders of SITRABI [both of whom are Plaintiffs in this case] would be taken to a radio station . . . where they would be forced to denounce the union."  Plaintiffs also allege that the actual Mayor of Morales participated.  He, along with "several other armed aggressors," allegedly accompanied Plaintiffs to a radio station.  There, Plaintiffs, at gunpoint, announced the labor dispute was over and that they were resigning.

Members of the security force then forced the two Plaintiffs back to the headquarters.  At headquarters, they received a facsimile of a "model resignation form," purportedly sent from Del Monte or Bandegua.  The Plaintiffs then signed the letters at gunpoint and were released -- after being detained for more than eight hours -- at 2:00 a.m. on 14 October 1999.  The leader of the security force

---

[2]Plaintiffs allege that the SITRABI headquarters are one-hundred meters from the National Police office.  Based on this spacial proximity, Plaintiffs conclude that "it was an absolute certainty that the National Police were aware of all events of the night."

allegedly threatened to kill Plaintiffs if they failed to leave Guatemala or relocated to Mexico. Plaintiffs now live in the United States.

Based on these allegations, Plaintiffs brought twelve claims against Del Monte and Bandegua in the district court. That court granted Del Monte's motion to dismiss for failure to state a claim. Plaintiffs have appealed the dismissal of their claims brought under the Alien Tort Act, 28 U.S.C. § 1350 ("ATA"), and the Torture Victim Protection Act, which is published as a historical and statutory note to the ATA, codified at 28 U.S.C. § 1350 (1991) ("TVPA").

**STANDARD OF REVIEW**

We review motions to dismiss *de novo*; all facts are taken from the complaint. Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1080 (11th Cir. 2004) (citations omitted). Ambiguities are construed in the light most favorable to the nonmovant, Plaintiffs. Miccosukee Tribe of Indians of Fla. v. So. Everglades Restoration Alliance, 304 F.3d 1076, 1084 (11th Cir. 2002). We can affirm the district court's dismissal of the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1069 (11th

5

Cir. 2004) (citing <u>Cryder v. Oxendine</u>, 24 F.3d 175, 176 (11th Cir. 1994) (internal quotations omitted)). But, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." <u>Oxford Asset Mgmt., Ltd. v. Jaharis</u>, 297 F.3d 1182, 1188 (11th Cir. 2002).

## DISCUSSION

1. *The Non-Torture Alien Tort Act Claims.*

The Alien Tort Act provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2005). To obtain relief under the ATA, plaintiffs must be (1) an alien, (2) suing for a tort, which was (3) committed in violation of international law. <u>Abebe-Jira v. Negewo</u>, 72 F.3d 844, 848 (11th Cir. 1996). The first two elements are not disputed. Del Monte does challenge Plaintiffs' contention that the underlying acts show a violation of the laws of nations: prohibitions against (1) cruel, inhuman, degrading treatment or punishment; (2) arbitrary detention; and (3) crimes against humanity.

The Supreme Court recently interpreted the Alien Tort Act in <u>Sosa v. Alvarez-Machain</u>, 124 S. Ct. 2739 (2004). There, the Court explained that the

6

ATA is jurisdictional in nature but that it also provides a cause of action "for the modest number of international law violations with a potential for personal liability at the time [of its enactment]." 124 S. Ct. at 2761.[3] According to the Court, causes of action under the ATA are not static; new ones may be recognized, if the claim is "based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized." 124 S. Ct. at 2761-62.[4] But the Court said that federal courts should exercise "great caution" when considering new causes of action, and maintain "vigilant doorkeeping . . . thus [opening the door] to a narrow class of international norms [recognized] today." 124 S. Ct. at 2763, 2764.

Based largely on our reading of Sosa, we agree with the district court's dismissal of Plaintiffs' non-torture claims under the Alien Tort Act. We see no basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment. In reaching this conclusion, we acknowledge that two district courts of this Circuit recognized such a cause of action. See Mehinovic v.

---

[3]Congress enacted the Alien Tort Act in 1789. The Court determined that three offenses were actionable at that time: violation of safe conducts, infringement of the rights of ambassadors, and piracy. Sosa, 124 S. Ct. at 2761.

[4]Our conclusion differs from dicta contained in Arce v. Garcia, 400 F.3d 1340, 1345 n.2 (11th Cir. 2005) (interpreting Sosa as limiting the Alien Tort Act to a grant of jurisdiction, not a cause of action).

7

Vuckovic, 198 F. Supp. 2d 1322, 1347 (N.D. Ga. 2002) (Bosnian war crimes);

Cabello v. Fernandez-Larios, 157 F. Supp. 2d 1345, 1361 (S.D. Fla. 2001)

(political assassination) aff'd on different grounds by 402 F.3d 1148, 1161 (11th

Cir. 2005).  But both of those courts relied on the International Covenant on Civil

and Political Rights, Mehinovic, 198 F.Supp. 2d at 1347, Cabello, 157 F.Supp.2d

at 1361.   Sosa explains that the International Covenant did not "create

obligations enforceable in the federal courts."  124 S. Ct. at 2767.  Accordingly,

we affirm the district court's decision on the cruel, inhuman, degrading treatment

or punishment claims.

We do the same for Plaintiffs' claim for arbitrary detention.  In Sosa, the

Court determined that "a single illegal detention of less than a day . . . violates no

norm of customary international law so well defined as to support the creation of a

federal remedy."  124 S. Ct. at 2769.  The detention alleged here was more

frightening than the one in Sosa; still, the short time of the detention here causes

the legal principle announced by the Court in Sosa to guide us.  We, therefore,

affirm the district court's conclusion.

We also agree with the district court's dismissal of the crimes against

humanity claim.  First, such crimes were not expressly plead in the complaint.  See

Emory v. Peeler, 756 F.2d 1547, 1550 n.3 (11th Cir. 1985) (considering only the

8

"naked complaint" when reviewing a motion to dismiss). Second, to the extent that crimes against humanity are recognized as violations of international law, they occur as a result of "widespread or systematic attack" against civilian populations. See Cabello v. Fernandez-Larios, 402 F.3d 1148, 1161 (11th Cir. 2005). Those kinds of words are not found in the complaint, but instead in Plaintiffs' appellate brief. The appellate brief cannot supply the necessary facts to overcome Del Monte's motion to dismiss. See Emory, 756 F.2d at 1550 n.3. And, Plaintiffs' reliance -- found exclusively in the appellate brief -- on alleged systematic and widespread efforts against organized labor in Guatemala is too tenuous to establish a prima facie case, especially in the light of Sosa's demand for vigilant doorkeeping.

2. *Claims For Torture Under The Alien Tort Act And Torture Victim Protection Act.*

a. State Action.

State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the Alien Tort Act. See Kadic v. Karadzic, 70 F.3d 232, 243-44 (2nd Cir. 1995) (citations omitted). The text of the Torture Victim Protection Act expressly requires the element of state action.

9

Torture Victim Protection Act § 2(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (Historical and Statutory Notes)).  In construing this state action requirement, we look "to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983."  Kadic, at 245.  A claim for state-sponsored torture under the Alien Tort Act or the Torture Victim Protection Act may be based on indirect liability as well as direct liability.  Cabello, 402 F.3d at 1157.  The Alien Tort Act "reaches conspiracies and accomplice liability," and the Torture Victim Protection Act reaches those who ordered, abetted, or assisted in the wrongful act.  Id.

The complaint alleges three state acts or acts by state officials. First, Plaintiffs argue that Guatemala sanctions the acts of private security forces by permitting them to exist legally.  (Compl. ¶¶ 66, 72).  Second, Plaintiffs allege the police knew of and deliberately ignored the events at the SITRABI headquarters.  (Compl. ¶ 55).  Third, Plaintiffs say broadly that unnamed "public officials . . . intentionally failed to take action in order to permit the violence to occur [and] were part of the security force."  (Compl. ¶ 29).  The complaint later names the Mayor as such an official, (Compl. ¶ 47), and it describes government officials of "the Bobos District" as "assisting" the security force.  (Compl. ¶ 66).

Guatemala's registration and toleration of private security forces does not transform those forces' acts into state acts.  See Moose Lodge No. 107 v. Irvis, 92

10

S. Ct. 1965, 1971-74 (1972) (concluding state's alcohol licensing and regulatory scheme did not transform a private club with a liquor license into a state actor).

In addition, police inaction in response to events occurring not in their plain sight, but at least one hundred meters and two walls away, does not establish state action.[5]  This lack of state action is particularly definite where, as here, Plaintiffs do not allege sufficient facts to warrant the inference that the National Police knew of and purposefully turned a blind eye to the events.  "[S]ome minimal pleading standard does exist. . . . 'Pleadings must be something more than an ingenious academic exercise in the conceivable.'"  Wagner v. Daewoo Heavy Indus. Am. Corp., 289 F.3d 1268, 1270 (11th Cir. 2002) (discussing generally what might be a reasonable inference in the pleading context) (internal citation omitted) rev'd en banc on other grounds, 314 F.3d 451 (11th Cir. 2002).

Plaintiffs allege the police station was spacially near the SITRABI headquarters, which leads Plaintiffs to deduce that the proximity made it certain the police knew of the events in question.  We must make reasonable inferences in Plaintiffs' favor, but we are not required to draw Plaintiffs' inference.  "Bald

---

[5]Paragraph fifty-five alleges that "As [Plaintiffs] walked outside [after resigning from the union], they all were able to see the National Police office, which was no more than 100 meters from the SITRABI office.  It was an absolute certainty that the National Police were aware of all of the events of the night, and yet they did nothing to intervene to protect the SITRABI leaders."

11

assertions" will not overcome a Rule 12(b)(6) motion. <u>DM Research, Inc. v. College of Am. Pathologists</u>, 170 F.3d 53, 55, 56 (1st Cir. 1999) (citation omitted) (affirming dismissal for failure to state a claim when complaint failed to allege "a factual predicate concrete enough to warrant further proceedings" and provided mere "speculations"). Likewise, "unwarranted deductions of fact" are not admitted as true in a motion to dismiss. <u>So. Fla. Water Dist. Mgmt. Dist. v. Montalvo</u>, 84 F.3d 402, 408 n.10 (11th Cir. 1996) (stating in dicta). The complaint here provides no factual basis to infer the police made a knowing choice to ignore Plaintiffs' alleged plight. It is unreasonable to infer, based on the facts alleged here (alleged torture occurring indoors and an allegedly coerced indoor radio address someplace else), that just spacial proximity provides a reasonable basis for knowledge or intent on the part of the police. <u>See generally</u> <u>Wagner</u>, 289 F.3d at 1272.

We cannot say, however, that a reasonable reading of the complaint's description of the Mayor's acts rules out state action. Paragraph twenty-nine is the first time government officials are mentioned: "public officials at the urging of Defendants and/or their agents intentionally failed to take action in order to permit the violence to occur. Further, various public officials were part of the security force." At least one public official, the Mayor, is identified by name in paragraph

12

forty-seven: "Israel Vargas, who was the Mayor of Morales District . . . and several other armed aggressors" took two Plaintiffs at gunpoint and against their will to a radio station. The complaint also alleges later, in paragraph seventy-two, that "government officials" actually "assisted" the security force.

In the context of the whole complaint, the district court appears to have read these passages to describe the Mayor as merely present and not an active member of the security force. Aldana v. Fresh Del Monte Produce, Inc., 305 F. Supp.2d 1285, 1302 (S.D. Fla. 2003). The district court's reading might be one reasonable reading of the complaint. We cannot say, however, that it is the only reasonable reading of the complaint. Especially when read together with paragraphs twenty-nine and seventy-two, paragraph forty-seven can reasonably be read as depicting the Mayor as an "armed aggressor," not a mere observer. See Magluta v. Samples, 375 F.3d 1269, 1274-75 (11th Cir. 2004) (reading complaint in its entirety when reviewing a motion to dismiss for failure to state a claim). See also 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004) (a reviewing court gives effect to all averments). At its most specific point, the complaint states that the Mayor "and several other armed aggressors" took two Plaintiffs at gunpoint and against Plaintiffs' wills to a radio station. "At worst, this language is ambiguous . . . and because the court was ruling on a motion to

13

dismiss, the complaint should be construed in the light most favorable" to Plaintiffs. Miccosukee Tribe of Indians of Fla. v. So. Everglades Restoration Alliance, 304 F.3d 1076, 1084 (11th Cir. 2002).

For Plaintiffs, the favorable construction of the complaint is that the Mayor was one of the armed aggressors. The Mayor's active involvement in the process could have provided a sufficiently affirmative act to establish state action.[6] Cabello v. Fernandez-Larios, 402 F.3d 1148, 1156 n.2 (11th Cir. 2005). The Mayor's "mere presence" may not establish state action, but his alleged participation in the forcible events could. See Cofield v. Randolph County Comm'n, 90 F.3d 468, 471 (11th Cir. 1996). Because we believe the alleged acts are sufficient for now to establish state action on the part of the Mayor, we do not address Plaintiffs' other contention that the Mayor's inaction facilitated and caused their harm.

b. Torture Claims.

The district court also decided that Plaintiffs' claims did not constitute torture under either the Alien Tort Act or the Torture Victim Protection Act.

---

[6]We stress that this litigation is at a preliminary stage that is very friendly to Plaintiffs. We cannot predict what evidence can be mustered at summary judgment (or beyond) that could support or refute this allegation from the complaint. We cannot be certain the time that the Mayor arrived on the scene. Because we must construe the complaint in Plaintiffs' favor, we accept today that he was present for the alleged acts of torture described below.

14

<u>Aldana v. Fresh Del Monte Produce, Inc.</u>, 305 F. Supp.2d 1285, 1294-95 (S.D.

Fla. 2003). A preliminary question we must decide is whether recovery is

permitted under the TVPA and the ATA, and if so, whether "torture" means the

same thing for both statutes. We conclude that a plaintiff may bring distinct

claims for torture under each statute.

The statutory texts support this conclusion. Torture is actionable under the

Alien Tort Act, but only if the conduct is "committed in violation of the laws of

nations." 28 U.S.C. § 1350 (2005).[7] By contrast, Congress provided an express

definition of torture in the Torture Victim Protection Act.[8] These two

---

[7]The Supreme Court defines the law of nations as being determined, "[w]here there is no treaty, and no controlling executive or legislative act or judicial decision, [by] the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." <u>Sosa</u>, 124 S. Ct. at 2766-67 (citing <u>The Paquete Habana</u>, 20 S. Ct. 290, 299 (1900)).

[8]

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

15

definitions suggest each statute provides a means to recover for torture as that term separately draws its meaning from each statute.

Precedent also supports this conclusion. In Abebe-Jira v. Negewo, 72 F.3d 844, 847-48 (11th Cir. 1996), we construed the Alien Tort Act as conferring both a forum and a private right of action. Nothing in Sosa changes this conclusion; in fact, it confirms it. 124 S. Ct. at 2761-62. When describing the TVPA, the Supreme Court said it was an example of Congress providing a "clear mandate" to allow recovery for claims "confined to [a] specific subject matter[:]" torture and extrajudicial killing. Id. at 2763. But the Court did not say that the authority

---

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from--

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

> (C) the threat of imminent death; or

> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act § 3(b), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (Historical and Statutory Notes)).

16

granted in the Torture Victim Protection Act provided the exclusive authority to hear torture claims. Contra Enahoro v. Abubakar, No. 03-3089, 2005 WL 1243178 at *6-7 (7th Cir. May 23, 2005).

We also rely on principles of statutory construction to reach our conclusion. To accept that the Torture Victim Protection Act provides the exclusive remedy for acts of torture is to accept that it amends the Alien Tort Act. Such an intent to amend is not apparent from the face of the statute, and "amendments by implication are disfavored. Only when Congress' intent to repeal or amend is clear and manifest will we conclude that a later act implicitly repeals or amends an earlier one." Patel v. Quality Inn So., 846 F.2d 700, 704 (11th Cir. 1988). That the TVPA, which was published in the Statues at Large, appears in the United States Code as a historical and statutory note to the Alien Tort Act does not make the TVPA any less the law of the land. See generally Schwier v. Cox, 340 F.3d 1284, 1288 (11th Cir. 2003).

Having decided that Plaintiffs can raise separate claims for state-sponsored torture under the Alien Tort Act and also under the Torture Victim Protection Act, we must decide whether the acts alleged in the complaint can be considered torture under (a) the law of nations (for ATA purposes); and (b) the TVPA's statutory definition. We conclude that Plaintiffs alleged sufficient facts to establish torture

causing severe mental suffering under both statutes.

When courts seek to define torture in international law, they often look to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, Supp. No. 51, U.N. Doc. A/39/51 (1984), reprinted in 23 I.L.M. 1027. See, e.g., In re Estate of Ferdinand Marcos Human Rights Litig. v. Estate of Marcos, 25 F.3d 1467, 1475 (9th Cir. 1994); Kadic, 70 F.3d at 243-44. Federal immigration law relies on the Convention when deciding whether aliens may be deported to nations that would torture them. United States Policy With Respect to the Involuntary Return of Persons in Danger of Subjection to Torture § (f), 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 (Historical and Statutory Note)). See also Cadet v. Bulger, 377 F.3d 1173, 1194 (11th Cir. 2004) (describing the Convention as providing "the only relevant definition of 'torture'" in the immigration context). Accordingly, we, for ATA purposes, too look to the Convention when deciding what constitutes torture according to the laws of nations. The Convention defines torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or

18

a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Part I, Article I, G.A. Res. 39/46, U.N. GAOR, Supp. No. 51, U.N. Doc. A/39/51 (1984), reprinted in 23 I.L.M. 1027. The Torture Victim Protection Act provides a different definition. In some case, the different definitions might actually make a difference; we recall that neither Congress nor the Supreme Court has urged us to read the TVPA as narrowly as we have been directed to read the Alien Tort Act generally. See Sosa, 124 S. Ct. at 2761-62.

Plaintiffs allege they were (a) in the custody or physical control of the security force; (b) suffered severe, prolonged mental and physical pain or suffering; by being (c) threatened with imminent death; for the purposes of (d) punishing Plaintiffs for their labor activities. The complaint alleges that Plaintiffs Hernandez, G. Martinez, M. Martinez, and Romero all were told they would be killed that night.[9] Plaintiff Aldana and M. Martinez were filmed with a video

---

[9]The complaint alleges that members of the security force --- who were armed, and thus had ready the means to kill -- told Plaintiffs Evans and Romero that they would be killed because of their "activities on behalf of SITRABI." (Compl. ¶ 34). In paragraph forty-five, the complaint attributes a member of the security force telling Romero that he would be burned alive. Paragraph thirty-seven describes Plaintiff M. Martinez's abduction: members of the security force told him "that they were going to kill him." Paragraph forty-three alleges a member of the

19

camera and told they "would be giving their last messages." (Compl. ¶ 48). The complaint does not mention specific threats against Plaintiff Rodriguez, nor does it say that Plaintiff Evans was told he would be killed that night.[10] But, another paragraph discusses a collective threat: taking pictures of the seven Plaintiffs, "stating that [a member of the security force] wanted a clear photo of the faces before he killed them all." (Compl. ¶ 45). These allegations describe imminent death threats: (1) the security force was heavily armed; (2) Plaintiffs were unarmed and restrained; and (3) for many hours the security force made specific threats that Plaintiffs (for their past acts) would be killed not sometime in the future, but that very night.

In addition, Plaintiffs allege in a paragraph addressing a negligent infliction of emotional distress claim, that they "have suffered and will continue to suffer . . . extreme and severe mental anguish and emotional distress." (Compl. ¶ 105).[11] All

_____

security force threatened Plaintiff G. Martinez by stating: "You won't mess with Bandegua after we cut your balls off and hang you!" The threat against Plaintiff Hernandez is contained in paragraph forty: a member of the security force "stepped forward and put a gun to Plaintiff Hernandez's head, threatening 'I'll make you smile.'"

[10]Paragraph thirty-nine addresses Rodriguez's entry to the SITRABI headquarters: "He was ordered at gunpoint by a leader of the security force . . . to get out of his car and go into the SITRABI office."

[11]The placement of the paragraph in another count is unimportant to our review of a district court's order dismissing a complaint under Rule 12(b) of the Federal Rules of Civil Procedure. We read the complaint as a whole. Magluta v. Samples, 375 F.3d 1269, 1274-75 (11th Cir. 2004). In addition, a formulaic misstep by counsel is not fatal under the notice pleading standard

things considered, the acts alleged in the complaint could constitute torture -- based on intentionally inflicted emotionally pain and suffering -- under the Alien Tort Act and Torture Victim Protection Act.

Plaintiffs' allegations of intentionally inflicted physical pain and suffering do not meet the statutory elements of torture under either the Alien Tort Act or Torture Victim Protection Act, however. Much of the pleading about physical -- as opposed to mental -- torture is conclusory. For example, the complaint contains paragraphs describing some Plaintiffs as being "tortured with physical violence." (Compl. ¶ 34). These kinds of allegations cannot overcome a motion to dismiss. See generally Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002) ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). Furthermore, the only specified acts of physical violence we can discern from the complaint involves pushing, shoving and having one's hair pulled. These acts do not constitute severe pain or suffering.

---

(where fair notice is all that is required) of Federal Rule of Civil Procedure 8(a). See generally, Swierkiewicz v. Sorema, N.A., 122 S. Ct. 992, 998, 999 (2002) (interpreting Rule 8(a) as focusing the "litigation on the merits of a claim"). See also 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004) (describing a pleading as judged "by the quality of its substance rather than according to its form or label and, if possible, it will be construed to give effect to all its averments"). Del Monte cannot say that it did not receive fair notice of the torture claim just because the language about lasting mental trauma was placed in another section of the complaint.

21

## CONCLUSION

We commend the district court for remembering that some minimal pleading standard does still exist and for that court's serious and thorough examination of the complaint. We affirm the district court's order dismissing Plaintiffs' complaint entirely, except we vacate the dismissal of Plaintiffs' claims -- under the Alien Tort Act and the Torture Victim Protection Act -- for alleged torture based on intentionally inflicted mental pain and suffering.

**AFFIRMED IN PART, VACATED IN PART, REMANDED.**