[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-16246

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 29, 2011
JOHN LEY
CLERK

D. C. Docket Nos. 07-22459-CV-AJ,
08-21063-CV-AJ


07-22459-CV-AJ:

ELOY ROJAS MAMANI,
ETELVINA ROMAS MAMANI,
SONIA ESPEJO VILLALOBOS,
HERNAN APAZA CUTIPA,
JUAN PATRICIO QUISPE MAMANI, et al.,

Plaintiffs-Appellees,

versus

JOSE CARLOS SANCHEZ BERZAIN,

Defendant-Appellant.

--------------------------------------------------------------------------------------------------

08-21063-CV-AJ:

ELOY ROYAS MAMANI,
Warisata, Bolivia,
ETELVINA RAMOS MAMANI,
Warisata, Bolivia,
SONIA ESPEJO VILLALOBOS,

El Alto, Bolivia,
JUAN PATRICIO QUISPE MAMANI,
El Alto, Bolivia,
TEOFILO BALTAZAR CERRO,
El Alto, Bolivia, et al.,

Plaintiffs-Appellees,

versus

GONZALO DANIEL SANCHEZ DE
LOZADA SANCHEZ BUSTAMANTE,

Defendant-Appellant.

_____

No. 10-13071

_____

D.C. Docket Nos. 1:07-cv-22459-AJ,
1:08-cv-21063-AJ

ELOY ROYAS MAMANI,
Warisata, Bolivia,
ETELVINA RAMOS MAMANI,
Warisata, Bolivia,
SONIA ESPEJO VILLALOBOS,
El Alto, Bolivia,
HERNAN APAZA CUTIPA,
JUAN PATRICIO QUISPE MAMANI,
El Alto, Bolivia, et al.,

Plaintiffs-Appellees,

versus

JOSE CARLOS SANCHEZ BERZAIN,
GONZALO SANCHEZ DE LOZADA SANCHEZ BUSTAMANTE,

                                        Defendants-Appellants.

                 _____

             Appeals from the United States District Court
                 for the Southern District of Florida
                 _____

                      (August 29, 2011)

Before EDMONDSON and MARCUS, Circuit Judges, and FAWSETT,[*] District
Judge.


EDMONDSON, Circuit Judge.


     Plaintiffs are the relatives of persons killed in Bolivia in 2003. All are

citizens and residents of Bolivia. Plaintiffs bring suit under the Alien Tort Statute

("ATS") against two of the former highest-level leaders of Bolivia--the former

president of Bolivia, Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante

("President"), and the former defense minister of Bolivia, José Carlos Sánchez

Berzaín ("Defense Minister," and together with the President, "defendants")--for

decisions these leaders allegedly made while in high office. Given the indefinite

_____

     [*] Honorable Patricia C. Fawsett, United States District Judge for the Middle District of
Florida, sitting by designation.

                                3

state of the pertinent international law and the conclusory pleadings, we decide that plaintiffs have failed to state a claim against these defendants.

## I. BACKGROUND

Plaintiffs' claims arise out of a time of severe civil unrest and political upheaval in Bolivia--involving thousands of people, mainly indigenous Aymara people--which ultimately led to an abrupt change in government. Briefly stated, a series of confrontations occurred between military and police forces and protesters. Large numbers of protesters were blocking major highways, preventing travelers from returning to La Paz, and threatening the capital's access to gas and presumably other needed things. Over two months, during the course of police and military operations to restore order, some people were killed and more were injured. The President ultimately resigned his responsibilities, and defendants withdrew from Bolivia. The entire complaint is attached as an appendix to this opinion.

Plaintiffs filed suit in federal district court against the President and Defense Minister personally but on account of their alleged acts as highest-level military and police officials. Plaintiffs do not contend that defendants personally killed or

4

injured anyone.  In their corrected amended consolidated complaint ("Complaint"), plaintiffs brought claims under the ATS, asserting that defendants violated international law by committing extrajudicial killings; by perpetrating crimes against humanity; and by violating rights to life, liberty, security of person, freedom of assembly, and freedom of association.[1]  Plaintiffs sought compensatory and punitive damages.

Defendants moved to dismiss, asserting that the Complaint raised political questions; that the act-of-state doctrine barred resolution of the suit; and that defendants were immune from suit under common law head-of-state immunity and the Foreign Sovereign Immunities Act.  Defendants also argued that plaintiffs failed to state a claim under the ATS and that plaintiffs' state law claims failed under both Maryland and Florida law.

The United States government notified the district court that it had received a diplomatic note from the current government of Bolivia in which the government of Bolivia formally waived any immunity that defendants might otherwise enjoy.  The United States government accepted the waiver but took no official position on the litigation.

---

[1] Plaintiffs also alleged violations of the Torture Victim Protection Act ("TVPA") and brought state law claims of wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.  These claims are not at issue in this limited interlocutory appeal.

5

The district court granted in part and denied in part defendants' motion to dismiss.[2] Defendants petitioned this Court for permission to bring an interlocutory appeal. We granted defendants' petition and allowed them to appeal the issue of the applicability of the political question doctrine and the issue of whether plaintiffs had stated a claim under the ATS.[3] We now reverse and conclude that plaintiffs have failed to state a plausible claim for relief against these defendants.

## II. DISCUSSION

On appeal, defendants argue that plaintiffs' suit is barred by the political question doctrine, that plaintiffs have failed to state a claim under the ATS, and that defendants are immune from suit. We conclude that plaintiffs have failed to plead facts sufficient to state a claim under the ATS against these defendants.[4]

---

[2] The district court concluded that neither the political question doctrine nor the act-of-state doctrine barred resolution of the suit; that defendants were not immune to suit; that seven of the nine plaintiffs had pleaded facts sufficient to state a claim under the ATS for extrajudicial killings; that plaintiffs had pleaded facts sufficient to state a claim under the ATS for crimes against humanity; and that plaintiffs' wrongful death claims were timely. The district court concluded that plaintiffs had not stated a claim for violations of the rights to life, liberty, security of persons, freedom of assembly, and association under the ATS. The district court also concluded that plaintiffs' state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence were time-barred.

[3] Defendants appeal as of right the district court's decision of no immunity.

[4] We accept that the present government of Bolivia has waived any immunity that defendants might otherwise enjoy. For background, see In re Doe, 860 F.2d 40, 44-46 (2d Cir.

6

A.


The ATS is no license for judicial innovation.  Just the opposite, the federal

courts must act as vigilant doorkeepers and exercise great caution when deciding

either to recognize new causes of action under the ATS or to broaden existing

causes of action.  See Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2764 (2004).

"[C]ourts should require any claim based on the present-day law of nations to rest

on a norm of international character accepted by the civilized world and defined

with a specificity comparable to [violation of safe conducts, infringement of the

rights of ambassadors, and piracy]."  Id. at 2761-62 (emphasis added).  This

standard is a high one.

For a violation of international law to be actionable under the ATS, the

offense must be based on present day, very widely accepted interpretations of

international law: the specific things the defendant is alleged to have done must

---

1988) (cited in United States v. Noriega, 117 F.3d 1206, 1212 (11th Cir. 1997)); In re Grand Jury
Proceedings, Doe No. 700, 817 F.2d 1108, 1110-11 (4th Cir. 1987).  This case presents no
political question: plaintiffs' tort claims require us to evaluate the lawfulness of the conduct of
specific persons towards plaintiffs' decedents, not to decide the legitimacy of our country's
executive branch's foreign policy decisions.  Cf. Linder v. Portocarrero, 963 F.2d 332, 337 (11th
Cir. 1992) (concluding plaintiffs' allegations of tort liability did not present a non-justiciable
political question where "the complaint challenge[d] neither the legitimacy of the United States
foreign policy toward the contras, nor d[id] it require the court to pronounce who was right and
who was wrong in the Nicaraguan civil war").  See also Abebe-Jira v. Negewo, 72 F.3d 844, 848
(11th Cir. 1996).

7

violate what the law already clearly is. High levels of generality will not do.

To determine whether the applicable international law is sufficiently definite, we look to the context of the case before us and ask whether established international law had already defined defendants' conduct as wrongful in that specific context. See id. at 2768 n.27. Claims lacking sufficient specificity must fail. See id. at 2769 ("Whatever may be said for the broad principle [the plaintiff] advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require.").

We do not look at these ATS cases from a moral perspective, but from a legal one. We do not decide what constitutes desirable government practices. We know and worry about the foreign policy implications of civil actions in federal courts against the leaders (even the former ones) of nations. And we accept that we must exercise particular caution when considering a claim that a former head of state acted unlawfully in governing his country's own citizens. "It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." Id. at 2763. Although "modern international law is very much concerned

8

with just such questions, and apt to stimulate calls for vindicating private interests in [ATS] cases," the Supreme Court instructs us that federal courts are to exercise "great caution" when deciding ATS claims. Id.

Broadly speaking, this Court has decided that "crimes against humanity" and "extrajudicial killings" may give rise to a cause of action under the ATS. See, e.g., Romero v. Drummond Co., 552 F.3d 1303, 1316 (11th Cir. 2008) (stating that an extrajudicial killing is actionable under the ATS where it is committed in violation of international law); Cabello v. Fernandez-Larios, 402 F.3d 1148, 1151-52 (11th Cir. 2005) (affirming judgment under the ATS for extrajudicial killing and crimes against humanity). But general propositions do not take us far in particular ATS cases. Allegations amounting to labels are different from well-pleaded facts, and we must examine whether what this Complaint says these defendants did--in non-conclusory factual allegations--amounts to a violation of already clearly established and specifically defined international law.

B.

To state a claim for relief under the ATS, a plaintiff must (1) be an alien (2) suing for a tort (3) committed in violation of the law of nations. Sinaltrainal v.

9

Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir. 2009).[5] To avoid dismissal of an ATS claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).

Stating a plausible claim for relief requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged": this obligation requires "more than a sheer possibility that a defendant has acted unlawfully." Id. While plaintiffs need not include "detailed factual allegations," they must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 127 S. Ct. at 1966).

Following the Supreme Court's approach in Iqbal, we begin by identifying conclusory allegations in the Complaint. See id. at 1950. Legal conclusions without adequate factual support are entitled to no assumption of truth. See id.;

---

[5] The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

10

Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010).

In their "Preliminary Statement," plaintiffs begin the Complaint by alleging that defendants "order[ed] Bolivian security forces, including military sharpshooters armed with high-powered rifles and soldiers and police wielding machine guns, to attack and kill scores of unarmed civilians."  Then, plaintiffs go on to allege in a conclusory fashion many other things: that defendants "exercised command responsibility over, conspired with, ratified, and/or aided and abetted subordinates in the Armed Forces . . . to commit acts of extrajudicial killing, crimes against humanity, and the other wrongful acts alleged herein"; that defendants "met with military leaders, other ministers in the Lozada government to plan widespread attacks involving the use of high-caliber weapons against protesters"; that defendants "knew or reasonably should have known of the pattern and practice of widespread, systematic attacks against the civilian population by subordinates under their command"; and that defendants "failed or refused to take all necessary measures to investigate and prevent these abuses, or to punish personnel under their command for committing such abuses."

These allegations sound much like those found insufficient by the Supreme Court in Iqbal: statements of legal conclusions rather than true factual allegations. Formulaic recitations of the elements of a claim, such as these, are conclusory and

11

are entitled to no assumption of truth. See Iqbal, 129 S. Ct. at 1951 (describing as conclusory allegations that "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin'" and that one defendant was a "principal architect" of and another was "'instrumental' in adopting and executing" the policy at issue (internal citations omitted)).

Plaintiffs here base their claims on allegations that defendants knew or should have known of wrongful violence taking place and failed in their duty to prevent it. Easy to say about leaders of nations, but without adequate factual support of more specific acts by these defendants, these "bare assertions" are "not entitled to be assumed true." Id. See also Sinaltrainal, 578 F.3d at 1268.

Next, we "consider the factual allegations in [plaintiffs'] complaint to determine if they plausibly suggest an entitlement to relief." Iqbal, 129 S. Ct. at 1951. Defendants were facing a situation where many of their opponents in Bolivia were acting boldly and disruptively (for example, blocking major highways to the nation's capital and forcing the Defense Minister out of at least one town), not merely holding--or talking about--political opinions. Plaintiffs pleaded facts sufficient to show that the President, in the face of significant conflict and

12

thousands of protesters, ordered the mobilization of a joint police and military operation to rescue trapped travelers; authorized the use of "necessary force" to reestablish public order; and authorized an executive decree declaring the transport of gas to the capital city to be a national priority.

Plaintiffs also pleaded facts sufficient to show that the Defense Minister, in the face of significant conflict and thousands of protestors, ordered the mobilization of a joint police and military operation to rescue trapped travelers; directed military personnel; authorized an executive decree declaring the transport of gas to the capital city to be a national priority; and, at times, accompanied military personnel in a helicopter from which shots were fired and directed them where to fire their weapons. Plaintiffs do not allege that a connection exists between the Defense Minister's directing of where to fire weapons and the death of plaintiffs' decedents.[6]

We must determine whether these facts, taken as a whole and drawing reasonable inferences in favor of plaintiffs, are sufficient to make out a plausible claim that these defendants did things that violated established international law and gave rise to jurisdiction under the ATS. We do not accept that, even if some

_____

[6] That the Defense Minister may have been directing military personnel not to fire at uninvolved civilians is consistent with the pleadings about his helicopter directives. See Iqbal, 129 S. Ct. at 1950-51 (discussing pleadings that are compatible with lawful inferences).

13

soldiers or policemen committed wrongful acts, present international law embraces strict liability akin to respondeat superior for national leaders at the top of the long chain of command in a case like this one. But before we decide who can be held responsible for a tort, we must look to see if an ATS tort has been pleaded at all.

We look first to plaintiffs' claims of extrajudicial killing, relying--as did plaintiffs--on the TVPA definition for guidance.[7] Briefly stated, the TVPA states that an extrajudicial killing must be "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." TVPA § 3(a), 28 U.S.C. § 1350.

The district court "conclude[d] that seven of the plaintiffs . . . stated claims for extrajudicial killings by alleging sufficient facts to plausibly suggest that the killings were targeted." D. Ct. Order 25. Facts suggesting some targeting are not enough to state a claim of extrajudicial killing under already established and specifically defined international law. But even if the Complaint includes factual

---

[7] Extrajudicial killings are actionable under the TVPA if the killing falls within the statutory definition, and under the ATS if committed "in violation of the law of nations." Romero, 552 F.3d at 1316. We assume for purposes of this discussion that an extrajudicial killing falling within the statutory definition of the TVPA would also likely violate established international law. But this may not be true under all circumstances. See Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1252 (11th Cir. 2005) ("[N]either Congress nor the Supreme Court has urged us to read the TVPA as narrowly as we have been directed to read the Alien Tort Act generally.").

14

allegations that are consistent with a deliberated killing by someone (for example, the actual shooters), not all deliberated killings are extrajudicial killings.

Plaintiffs allege no facts showing that the deaths in this case met the minimal requirement for extrajudicial killing--that is, that plaintiffs' decedents' deaths were "deliberate" in the sense of being undertaken with studied consideration and purpose. On the contrary: even reading the well-pleaded allegations of fact in the Complaint in plaintiffs' favor, each of the plaintiffs' decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising.[8]

Given these pleadings, alternative explanations (other than extrajudicial killing) for the pertinent seven deaths easily come to mind; for instance, the alleged deaths are compatible with accidental or negligent shooting (including mistakenly identifying a target as a person who did pose a threat to others), individual motivations (personal reasons) not linked to defendants, and so on. For

_____

[8] The Complaint may possibly include factual allegations that seem consistent with ATS liability for extrajudicial killing for someone: for example, the shooters. But to decide whether plaintiffs have stated a claim for extrajudicial killing against these defendants, we must look at the facts connecting what these defendants personally did to the particular alleged wrongs. For extrajudicial killings, we do not accept the following statement of the district court as correct as a matter of international law or of federal court pleading: "The plaintiffs here allege that their relatives were killed by the Bolivian armed forces and that at all relevant times the armed forces acted under the authority of [defendants]. This is sufficient." D. Ct. Order 27 (citation omitted). We believe it is insufficient. We do not, in principle, rule out aiding and abetting liability or conspiratorial liability and so on under the ATS, but the pleadings here are too conclusory to make out such a claim against these defendants.

15

background, see Iqbal, 129 S. Ct. at 1950-51. Plaintiffs have not pleaded facts sufficient to show that anyone--especially these defendants, in their capacity as high-level officials--committed extrajudicial killings within the meaning of established international law. See generally Belhas v. Ya'alon, 515 F.3d 1279, 1293 (D.C. Cir. 2008) (Williams, J., concurring) ("[Plaintiffs] point to no case where similar high-level decisions on military tactics and strategy during a modern military operation have been held to constitute . . . extrajudicial killing under international law.").[9]

Nor have plaintiffs pleaded facts sufficient to state a claim for a crime against humanity pursuant to established international law. "[T]o the extent that crimes against humanity are recognized as violations of international law, they occur as a result of 'widespread or systematic attack' against civilian populations." Aldana, 416 F.3d at 1247 (quoting Cabello, 402 F.3d at 1161).

_____

[9] We note the district court said in its Order that "it is not clear what constitutes an extrajudicial killing." D. Ct. Order 24. We agree. When the law applicable to the circumstances is unclear, we have been warned not to create or broaden a cause of action. See Sosa, 124 S. Ct. at 2766 n.21 (noting the "requirement of clear definition" for seeking relief from a violation of customary international law). The only case from this Circuit to give detailed consideration to the merits of a claim of extrajudicial killing under the ATS was different and clearer than this case. In Cabello, we concluded that there was sufficient evidence to support a jury verdict where the former military officer defendant personally commanded a "killing squad" that killed civilian prisoners who had opposed the military junta; where the defendant assisted in selecting the plaintiff's decedent (a political prisoner) for execution after reviewing his prisoner file; and where the political prisoner was then tortured and killed by the defendant. Cabello, 402 F.3d at 1159-60. The specific targeting of the victim based on his political beliefs, direct involvement of the defendant, and premeditated and deliberate circumstances of the victim's death set Cabello apart from the facts alleged in this case.

16

The scope of what is, for example, widespread enough to be a crime against humanity is hard to know given the current state of the law.

The Complaint's factual allegations show that defendants ordered military and police forces to restore order, to rescue trapped travelers, to unblock roads (including major highways), and to ensure the capital city's access to gas and presumably to other necessities during a time of violent unrest and resistance. According to plaintiffs, the toll--one arising from a significant civil disturbance-- was fewer than 70 killed and about 400 injured to some degree, over about two months. The alleged toll is sufficient to cause concern and distress. Nevertheless, especially given the mass demonstrations, as well as the threat to the capital city and to public safety, we cannot conclude that the scale of this loss of life and of these injuries is sufficiently widespread--or that wrongs were sufficiently systematic, as opposed to isolated events (even if a series of them)--to amount definitely to a crime against humanity under already established international law.

Allowing plaintiffs' claims to go forward would substantially broaden, in fact, the kinds of circumstances from which claims may properly be brought under the ATS. As we understand the established international law that can give rise to federal jurisdiction under the ATS, crimes against humanity exhibit especially wicked conduct that is carried out in an extensive, organized, and deliberate way,

and that is plainly unjustified.  It is this kind of hateful conduct that might make someone a common enemy of all mankind.  But given international law as it is now established, the conduct described in the bare factual allegations of the Complaint is not sufficient to be a crime against humanity under the ATS.

The possibility that--if even a possibility has been alleged effectively--these defendants acted unlawfully is not enough for a plausible claim.  And the well-pleaded facts in this case do not equal the kind of conduct that has been already clearly established by international law as extrajudicial killings or as crimes against humanity.  Plaintiffs "would need to allege more by way of factual content to 'nudg[e]' [their claims] . . . 'across the line from conceivable to plausible.'"  Iqbal, 129 S. Ct. at 1952 (quoting Twombly, 127 S. Ct. at 1974).  The Complaint does not state a plausible claim that these defendants violated international law, and these claims must be dismissed.

### III.  CONCLUSION

The Complaint in this case has all of the flaws against which Iqbal warned. In addition, the case runs into the limitations that Sosa set for ATS cases: judicial creativity is not justified.  See Sosa, 124 S. Ct. at 2763.  For ATS purposes, no tort

18

has been stated.

Plaintiffs, through their claims, seek to have us broaden the offenses of extrajudicial killings and crimes against humanity. Given the context, the pleadings are highly conclusory; and the international law applicable to the specific circumstances is not clearly defined. As we see it, the criteria to judge what is lawful and what is not lawful, especially for national leaders facing thousands of people taking to the streets in opposition, is largely lacking.

In a case like this one, judicial restraint is demanded. <u>See id.</u> at 2762. The ATS is only a jurisdictional grant; it does not give the federal courts "power to mold substantive law." <u>Id.</u> at 2755. Because the pertinent international law is not already clear, definite, or universal enough to reach the alleged conduct (especially after the pleadings are stripped of conclusory statements), we decline to expand the kinds of circumstances that may be actionable under the ATS to cover the facts alleged in this case. The denial of the motion to dismiss these claims is REVERSED.

REVERSED and REMANDED with instructions to dismiss.

19

**UNITED STATES DISTRICT**

**COURT SOUTHERN DISTRICT**

**OF FLORIDA**

**MIAMI DIVISION**

ELOY ROJAS MAMANI, ETEL VINA RAMOS MAMANL SONIA ESPEJO VILLALOBOS, HERNAN APAZA CUTIPA, JUAN PATRICIO QUISPE MAMAN!, TEOFILO BALTAZAR CERRO, JUANA VALENCIA DE CARVAJAL, HERMOGENES BERNARE CALLIZAYA, GONZALO MAMAN! AGUILAR, AND FELICIDAD ROSA HUANCA QUISPE

Plaintiffs,

V,

GONZALO DANIEL SANCHEZ DE LOZADA SANCHEZ BUSTAMANTE,

Defendant.

ELOY ROJAS MAMAN!, ETELVINA RAMOS MAMAN!, SONIA ESPEJO VILLALOBOS, HERNAN APAZA CUTIPA, JUAN PATRICIO QUISPE MAMAN!, TEOFILO BALTAZAR CERRO, JUANA VALENCIA DE CARVAJAL, HERM6GENES BERNABÉ CALLIZAYA, GONZALO MAMAN! AGUILAR, AND FELICIDAD ROSA HUANCA QUISPE

Plaintiffs,

JOSÉ CAJU S SANCHEZ BERZAIN,

Defendant.

20

**Case No. 08-21063-Civ-(JORDAN)**

**CORRECTED AMENDED**

**CONSOLIDATED COMPLAINT FOR**

**EXTRAJUDICIAL KILLING; CRIMES**

**AGAINST HUMANITY; VIOLATION**

**OF THE RIGHTS TO LIFE, LIBERTY,**

**AND SECURITY OF PERSON AND**

**FREEDOM OF ASSEMBLY AND**

**ASSOCIATION; WRONGFUL**

**DEATH; INTENTIONAL INFLICTION**

**OF EMOTIONAL DISTRESS;**

**NEGLIGENT INFLICTION OF**

**EMOTIONAL DISTRESS; AND**

**NEGLIGENCE**

**JURY TRIAL DEMANDED**

**Case Na. 07-22459-Civ-(JO C EY)**

D I X

**PRELIMINARY STATEMENT**

This is a civil action for compensatory and punitive damages against the ex

President of Bolivia, Gonzalo Daniel Sanchez de Lozada Sanchez Bustamante ("Defendant

Lozada" or "Lozada"), and ex-Minister of Defense of Bolivia, Jose' Carlos Sanchez Berzain

("Defendant Sanchez Berzain" or "Sanchez Berzain"), (collectively "Defendants"), for their role

in the massacre of Bolivian civilians in September and October 2003. During that period, many

Bolivians engaged in protests against unpopular policies of the Bolivian government. The

Defendants' response to the protests of September and October 2003 was to order Bolivian

security forces, including military sharpshooters arnied with high-powered rifles and soldiers and

22

police wielding machine guns, to attack and kill scores of unarmed civilians, many of who

including the victims on whose behalf Plaintiffs are suing -- were not involved in the protests at

all, and who were not even in the vicinity of the protests. In all, security forces under the

direction of Defendants intentionally killed 67 and injured over 400, primarily members of

Bolivia's indigenous Aymara communities.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action based on 28 U.S.C. § 1350; 28 U.S.C.

§ 1331; and 28 U.S.C. § 1332.

3. This Court also has Supplemental Jurisdiction over Plaintiffs' state law claims

based on 28 U.S.0 § 1367.

4, This Court has personal jurisdiction over Defendant Londa pursuant to the April

15, 2008 Order of the United States District Court for the District of Maryland. This Court has

23

personal jurisdiction over Defendant Sanchez Be in, as he is a resident of this District.

## PARTIES

5. On information and belief, Defendant Lozada is a Bolivian citizen and, since he fled Bolivia in October 2003, he has been a resident of the United States, currently residing in Chevy Chase, Maryland. From August 1993 to August 1997 and again from August 2002 to October 2003, Defendant Lozada served as President of the Republic of Bolivia.

6 On information and belief, Defendant Sanchez Berzain is a Bolivian citizen and, since he fled Bolivia in October 2003, he has been a resident of the United States. On information and belief, he currently resides in Key Biscayne, Florida.

7. At all relevant times in September and October 2003, Defendant Lozada, as President and Captain General of the Armed Forces, and Defendant Sanchez Berzain, as Minister of Defense of the Republic of Bolivia, possessed and exercised command and control over the

24

Armed Forces of the country, which includes the permanent forces of the Army, Navy and Air Force, as well as reserve or auxiliary forces (including, among others, the police).

8. Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani, husband and wife, are natives and citizens of Bolivia, who reside in Warisata, Bolivia. They bring this action in their individual capacities and on behalf of their eight-year-old daughter, Marlene Nancy Rojas Ramos, who was killed on September 20, 2003 in the family home in Warisata by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

9. Plaintiff Soma Espejo Villalobos is a native and citizen of Bolivia, who resides in El Alto, Bolivia. She brings this action in her individual capacity and on behalf of her husband, Lucio Santos Gandarillas Ayala, who was killed on October 12, 2003 in the Senkata zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

10. Plaintiff Hernân Apaza Cutipa is a native and citizen of Bolivia, who resides in El

25

Alto, Bolivia. He brings this action in his individual capacity and on behalf of his sister, Roxana Apaza Cutipa, who was killed on October 12, 2003 in her home in the Los Andes zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

11. Plaintiff Juan Patricio Quispe Mamani is a native and citizen of Bolivia, who resides in El Alto, Bolivia. He brings this action in his individual capacity and on behalf of his brother, Constantino Quispe Mamani, who was killed on October 12, 2003 in the Rio Seco region of El Alto by the Bolivian Aimed Forces or persons or groups acting in coordination with the Armed Forces or under their control.

12. Plaintiff Te6filo Baltazar Cerro is a native and citizen of Bolivia, who resides in El Alto, Bolivia. He brings this action in his individual capacity and on behalf of his wife, Teodosia Morales Mamani, who was killed on October 12, 2003 in Teodosia's sister's home in the Rio Seco zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the Armed Forces or under their control. At the time of the shooting, decedent was five months pregnant.

13. Plaintiff Juana Valencia de Carvajal is a native and citizen of Bolivia, who resides in El Alto, Bolivia. She brings this action in her individual capacity and on behalf of her husband, Marcelino Carvajal Lucero, who was killed on October 12, 2003 in the Tunari zone of El Alto by the Bolivian Armed Forces or persons or groups acting in coordination with the

26

Armed Forces or under their control.

14. Plaintiff Hermdgenes Bemabé Callizaya is a native and citizen of Bolivia, who resides in Apaita, Bolivia. He brings this action in his individual capacity and on behalf of his father, Jacinto Bemabé Roque, who was killed on October 13, 2003 in the Animas area near Apatia by the Bolivian Armed Forces.

15. Plaintiff Gonzalo Mamani Aguilar is a native and citizen of Bolivia, who resides in Apafia. Bolivia. He brings this action in his individual capacity and on behalf of his father, Arturo Mamani Maman i, who was killed on October 13, 2003 in the Animas area near Apafia by the Bolivian Armed Forces.

16. Plaintiff Felicidad Rosa Huanca Quispe is a native and citizen of Bolivia, who resides in Ovejuyo, Bolivia. She brings this action in her individual capacity and on behalf of her father, Rafil Ramón Huanca Marquez, who was killed on October 13, 2003 in Ovejuyo by the Bolivian Armed Forces.

17. All Plaintiffs' Decedents were Aymara natives of Bolivia.

**STATEMENT OF FACTS**

18. Defendant Lozada was President of Bolivia from August 1993 to August 1997 and from August 2002 to October 2003.

27

19. Defendant Sanchez Berzain was Minister of the Interior during Defendant

Lozada's first term as President, and Minister of Defense at all relevant times in September and

October 2003.

20. During his first term, Defendant Lozada oversaw the sale of state industries,

provoking widespread domestic criticism based on allegations that these sales were corrupt and

were made to companies with which he had close personal ties.

21. Violent suppression of those who criticized the government marked Defendant

Lozada's first term as President. In response to protests, his administration reacted brutally,

inflicting hundreds of civilian casualties. Defendant Sânchez Berzain served as Minister of the

Interior during this administration, and was widely believed to have been closely involved with

the violence.

22. During his second tern). as President of Bolivia, from August 2002 to October

2003, Defendant Lozada's administration again employed violence to quell widespread popular

criticism of his policies, specifically his economic programs.

23. Defendant Lozada's administration used military force to silence opposition and

intimidate the civilian population, particularly poor and indigenous people.

a) In two separate incidents in January 2003, the government responded violently

to protests, killing demonstrators.

b) Less than a month later, on February 12, 2003, Defendant Lozada ordered the

28

Armed Forces to suppress a strike organized by police against a recently implemented controversial income tax, again killing demonstrators. The following day, massive popular protests began in response to the killings by the government, and the soldiers sent by Defendant Lozada attempted to impose control with further violence.

c) In the first two months of 2003, government security forces were responsible for at least 38 deaths and 182 injuries. Although the government later provided some compensation to victims, it ailed to investigate or to punish those responsible.

24. Incidents of military violence against the civilian population continued over the next several months.

25. By September 2003, Defendant Sdnchez Berzain was serving as Minister of Defense in the Lozada government.

26. In early September 2003, thousands of rural villagers began to congregate in and around El Alto to protest government policies. On September 8, 2003, these villagers and Aymara community members from El Alto and surrounding areas, up to 15,000 in all, marched toward the neighboring city of La Paz. Their list of complaints included a new local tax and the detention of a community leader.

27. In the ensuing days and weeks, communities beyond the El Alto area joined the protests. The protests increasingly focused on recent policy changes involving the sale of Bolivia's natural gas, which protesters believed to be corrupt.

28. On September 15, 2003, unions and community groups began widespread street

protests and a general civil strike to oppose the natural gas sales. Aymara community groups

blocked major highways, halting automobile traffic on some routes into La Paz.

29. Around this time, travelers in Sorata, a rural highland village north of La Paz,

were unable to return to the city because of the closed roads.

30. On September 19, 2003, Defendants, along with Minister of the Interior Yerko

Kukoc, ordered the mobilization of a joint police and military operation that they asserted was

intended to "rescue- the group of travelers in Sorata. Late on September 19, 2003, security

forces left for Sorata.

**The Events of September 20, 2003**

31. On September 20, 2003, at 5:30 a.m., the military arrived in Warisata, where a small group was demonstrating on the road, Warisata is a small village between Sorata and La Paz.

32. The military shot tear gas and bullets upon their arrival. That day, villagers went into hiding in their homes and in the surrounding hills.

33. An elderly man, Alejandro Apaza Huallpa, heard the sound of gunfire and villagers shouting, and saw the military convoy's flashing lights. He and his wife came out of their house, located a few hundred feet from the road. Soldiers came off the road, and two of them took Mr. Apaza into custody, putting him in a truck. Later, at a deserted area, the security forces assaulted him with kicks, punches and rifle butts. After a day, they released him in La Paz. It took him three days to return home to his wife.

34. The military and police convoy arrived in Sorata around 8:00 a.m. Defendant Sanchez Berzain was present in Sorata directing military personnel. Protesting local villagers forced Defendant Sanchez Berzain out of town. The convoy left Sorata for La Paz around 9:20 a.m. with the travelers.

35. Outside Sorata, local villagers blocked the road with rocks. The military chased the unarmed villagers along the ridge overlooking the road for approximately thirty minutes.

31

Military personnel shot and killed an elderly man, Demetrio Coraca Castro, who was among

those being chased by the military.

36 That afternoon. Defendant Lozada ordered the Bolivian Army, Air Force. an

Navy to form a task force and authorized the use of "necessary force- to reestablish public order,

a detem ination codified in Directive 27/03. Defendant Sanchez Berzain, as Minister of Defense,

responsible for the implementation of this Directive.

37. By early afternoon, the townspeople of Warisata received notice that the military

was returning from Sorata. Villagers from the area came to Warisata to protest the military's use

of deadly force in Sorata, news of which had spread among local communities The security

forces approached Warisata from the direction of Sorata as well as from La Paz.

38. While security forces were on the ground, Defendant Sanchez Berzain engaged in

the military operation from a helicopter in the area of Warisata at the time of these events. Shots

were fired from a helicopter at the villagers below, and military planes were also spotted in the

area.

39. The military used sharpshooters and machine guns in its attacks on civilians in

Warisata. In Bolivia, only officers—and not conscripted soldiers—are trained as sharpshooters.

Additionally, it is generally officers, and not soldiers, who carry machine guns.

40. That afternoon, eight-year-old Marlene Nancy Rojas Ramos ("Marlene") was at

32

home in Warisata with her mother, Plaintiff Etelvina Ramos Mamani, who had just given birth.

Marlene was on the second floor of their house, which is a significant distance from the site where villagers had demonstrated that morning in Warisata. Moments after going to look out a window from inside her home, she was shot by the military. On information and belief, a sharpshooter fired the shot from at least several hundred yards; no other shots hit the house either before or after the shooting of Marlene. The single bullet passed through Marlene's chest and pierced the wall behind her. She fell onto the bed where her mother was lying with the baby.

Marlene died seconds later in her mother's arms. Marlene's mother clutched her dead child's body for nearly half an hour until a relative pried Marlene from her arms. Marlene's father, Plaintiff Eloy Rojas Mamani ("Mr. Rojas"), heard that his daughter had been shot and came down from the hills where he had fled to avoid the military. He was fired upon continuously as he crawled back to his home. When he arrived back at his family home and confumed that his daughter had been killed, he experienced extreme emotional and physical distress.

41. That day in Warisata, in addition to Marlene, two other civilians were killed by the military, and one soldier was killed by gunfire from an unknown source. The entry and exit wounds that killed one of the civilians suggest that he was shot from above, possibly from a helicopter or military aircraft seen flying over the area.

**The Events of Early October 2003**

42. On and after September 20, 2003, Bolivian media provided extensive coverage and criticism of the government's excessive use of force in Sorata and Warisata, as well as of the

decisions made by Defendant Sanchez Berzarn, Defendant Lozada, and others in the administration to use the military to address the situation.

43. On October 1, 2003, Aymara villagers blocked roads again to protest the events in Warisata and Sorata. Strikes spread throughout the highlands and countryside.

44. A week later, on October 8, 2003, with the issue of the corrupt sale of gas still unresolved, community organizations called for an indefinite general strike.

45. On the evening of October 9, 2003, Father Modesto Chino Mamani ("Father Chino-), a Catholic priest in the El Alto area, was returning from tending to a sick parishioner when a group of street protesters approached him. He saw police grabbing people, beating and humiliating them. People asked him to help halt the security forces' violence toward civilians in El Alto and to inform the media about the abuses. Father Chino contacted the media and put on

his priestly vestments so that he could safely approach the security forces. Father Chino then walked up to a police formation and tried to speak with them. Instead, they fired rubber bullets

directly at him, injuring his leg.

46. On October 9, 2003, two more civilians were killed and more than twenty were

injured, increasing popular outrage toward Defendants and toward the Lozada government.

Three more civilians were injured the next day. On October 11, 2003, the security forces killed

three more civilians, including a five-year-old boy, who was shot on the terrace of his home, far

from where the demonstrations took place. On information and belief, the boy was

targeted by a sharpshooter.

34

47. On October 11, 2003, Defendants authorized Executive Decree *(Decreto Supremo)* 27209. The Executive Decree established a state of emergency in the country, declaring the transport of gas to La Paz a national priority.

48. Anticipating that the government forces would use deadly force and indiscriminate violence, a clause in the Executive Decree offered indemnification for damages to persons and property resulting from the government's actions.

49. Executive Decree 27209 falsely states that there was a meeting of the full Council of Ministers on October 11, 2003. In fact, a meeting of the full Council did not occur on that date. The Decree also falsely states that all of the ministers had signed the Decree on October 1 1, 2003. In fact, some signatures were not obtained until October 13, 2003.

50. In addition, Executive Decree 27209 was not published in the Official Gazette of Bolivia *(Gaceta Oficial de Bolivia)* until October 17, 2003. It is a well-established legal principle and accepted practice in Bolivia that such decrees do not go into effect until they are published in the Gazette.

10

**The Events of October 12, 2003**

51. On October 12, 2003, the military and police killed 30 civilians and injured more than 100 in and around the city of El Alto.

52. As with the earlier incidents in September 2003, a helicopter flew over the area in

35

El Alto during the attacks on civilians by the military.

53. Near the Senkata gas plant in El Alto, a tractor emerged onto the main road. Military officers came out of the tractor, unaccompanied by soldiers, and fired shots into the air. Protesters fled in two directions; many ran down a street perpendicular to the main road.

54. Approximately five military officers then took up firing positions at the intersection of the main road and the side street and began shooting directly at civilians in the road with rifles and machine guns from at least one block away. The officers first shot and killed Eduardo Baltazar Hino, a thirty-five-year-old man, when he looked out from his hiding place behind a kiosk. An officer also shot Plaintiff Sonia Espejo Villalobos' husband, Lucio Santos Gandarillas Ayala ("Mr. Gandarillas"). Shortly thereafter, he was taken into a small store, where he was unable to leave to seek treatment for his injuries until the military left. Plaintiff, his wife, received a call from her sister-in-law informing her that Mr. Gandarillas was in the hospital, where Plaintiff found him still alive but losing blood quickly. She then accompanied him in an ambulance to a different hospital. Mr. Gandarillas was bleeding and screaming in pain during the entire trip, and later died in the hospital from his injuries.

55. Nineteen-year-old Roxana Apaza Cutipa ("Ms. Apaza.), the sister of Plaintiff HemAn Apaza Cutipa ("Mr. Ap '), was in her house away from the protests when the military stormed El Alto. Ms. Apaza, along with two younger siblings and her niece, went to the fourth floor terrace around 6:00 p.m. on October 12, 2003. They heard shots in the distance: there were neither military nor protesters congregated in front of or near her home. As soon as she peeked over the ledge of the terrace, the military shot her. The bullet passed through her head into the

36

opposite wall. On information and belief, she was shot by a sharpshooter. Mr. Apaza found his sister dead on the terrace several minutes later, after his younger brother told him that she had been shot. The death of Ms. Apaza, the oldest female sibling, was devastating for the family, as the six children had been orphaned several years earlier. Her younger siblings depended heavily

on Ms. Apaza.

56. On October 12, 2003, forty-two-year-old Constantino Quispe Mamani ("Mr. Constantino Quispe"), the brother of Plaintiff Juan Patricio Quispe Mamani ("Mr. Juan Patricio

Quispe"), went out to check on his property in El Alto, which he believed might have been

damaged that day. He was found badly wounded later that evening. He had been shot in the

lower back by a bullet that passed through his abdomen. Mr. Juan Patricio Quispe was informed

in the early evening that his brother had been badly wounded, and went to the hospital, where he

found his brother on a stretcher. Mr. Constantino Quispe died from his wounds three days later

in the hospital. Since that death, Mr. Juan Patricio Quispe has been responsible for raising and

providing for Decedent's son, Ronald Quispe de la Oliva.

57. Teodosia Morales Mamani ("Ms. Morales"), a thirty-nine-year-old pregnant

mother with seven children, was visiting family in El Alto on October 12, 2003. At that time,

she was not engaged in any protests against the government. A bullet, fired by the military,

blasted through the wall of the house she was in, hitting Ms. Morales' abdomen and exiting

through her chest. A relative told her common-law husband and father of her children, Plaintiff

Teôfilo Baltazar Cerro ("Mr. Baltazar"), that Ms. Morales had been injured. Mr. Baltazar took

her to a hospital in La Paz where she arrived around 1 1:30 p.m. on October 12, 2003, Their

unborn child died that night. Ms. Morales died in the early hours of October 14, 2003 without

ever leaving the hospital. Plaintiff is now the sole supporter of their seven children.

58. Fifty-nine-year-old Marcelino Carvajal Lucero was in his house in El Alto with

his wife, Plaintiff Juana Valencia de Carvajal ("Mrs. Carvajal"), in the early evening of October

12, 2003. When he went to close a window, military personnel shot him in the chest. The bullet

passed through his body and entered the wall behind him. Mrs. Carvajal came to her husband's

aid as he lay on the floor, bleeding. Despite his wife's efforts to stop the bleeding, he died before

he could receive any medical attention. Mrs. Carvajal would not take her deceased husband to

the morgue because she feared the government would disappear the body, and instead took it to

the parish where a wake was held.

**The Events of October 13, 2003**

59. In a nationally-televised address on October 13, 2003, Defendant Lozada did not

order an end to the violence; instead, he used the occasion to accuse protesters of being traitors

and subversives and of attempting a coup funded by international financiers.

60. On the morning of October 13, 2003, then Vice President Carlos Mesa appeared

on television to distance himself from Defendant Lozada's government and stated, "Neither as a

citizen nor a man of principles can I accept that, faced with popular pressure, the response should

be death."

61 . Nonetheless, violence by security forces against civilians, including

killings, continued,

62. By October 13. 2003 military units were encamped near Lake Animas on the

road between the villages of Apafia and Uni, on the outskirts of La Paz.

13

63. On the morning of October 13, 2003, a group of approximately 400 villagers from

Ovejuyo and surrounding villages walked toward Lake Animas. At a guardhouse near the lake,

they were confronted by a company of approximately 90 soldiers who were spread out over the

road. The military opened fire with rifles and machine guns, and the villagers fled in different

directions. The military continued to fire on the fleeing villagers, who sought refuge in hills and

ditches nearby.

64. Over the course of the next several hours, the military killed seven civilians and,

on information and belief, one conscripted soldier. Three of the dead were killed by a single shot

to the head, including the soldier. On information and belief, military sharpshooters fired these

and other shots.

65. The first person shot and killed in the area was Get 6n Carvajal Valencia ("Mr. Carvajal"), a thirty-five-year-old man. After the military opened fire, Mr. Carvajal hid in the hills. When he peeked out from behind a rock, military personnel shot him in the forehead from a distance of several hundred yards.

66. Also killed by a single shot to the head—a bullet piercing the cheek and exiting the back of the head—was Marcelo Hugo Cusi Vargas, a twenty-one-year-old man.

67. The third victim shot in this fashion was Edgar Lecofia Amaru, a nineteen-year old soldier, killed with a single shot through his eye. The nature of the injury suggests that he was killed by a sharpshooter. Mr. Lecofia was killed mid-morning near Lake Animas. The autopsy on his cadaver was performed in La Paz at 1:30 p.m. that same day. Military conscripts in Mr. Lecofia's regiment later told his family that an officer had shot Mr. Lecofia.

68. Only military officers in the Bolivian Armed Forces receive sharpshooter training.

14

69. After about an hour of constant firing on the ground, a helicopter arrived on the scene, firing as it flew overhead. The helicopter carried Defendant Sanchez Berzain, who was directing military personnel in the helicopter where to fire their weapons. The helicopter flew over the area, circling twice and firing at civilians on the ground before landing in Uni.

Soldiers

unloaded munitions from the helicopter and delivered them to other military personnel, who

were dispersed throughout the hills in the area. Thereafter the shooting intensified again as the

military encircled the Animas area.

70. Plaintiff Hermdgenes Bemabé Callizaya's father, Jacinto Bemabé Roque ("Mr.

BemabC), a sixty-one-year-old man, left Apafia headed for another son's home in Uni on

October 13, 2003. He intended to walk through the hills so that he could retrieve his crop of

lettuce and carry it back to Apaila. While Mr. Bemabé was walking through the hills, the

military shot and killed him.

71. On October 13, 2003, after the military began shooting, Domingo Mamani

Mamani ("Mr. Domingo Mamani"), a thirty-two-year-old man, was hiding in the hills. As he

reached the crest of a hill, the military shot and killed him. His nephew, Plaintiff Gonzalo

Mamani Aguilar ("Mr. Gonzalo Mamani"), a teenager at the time, witnessed the killing.

72. That morning, Arturo Mamani Mamani ("Mr. Arturo Mamani"), a forty-two-year

old man, was tending his family's small potato field with his son, Mr. Gonzalo Mamani. The

field was in the hills hundreds of meters above the road, and out of view of the military

personnel below. After military personnel began firing, Mr. Arturo Mamani and his son climbed

higher up into the hills to see what was happening below. While his son hid in a crevice a short

distance away, Mr. Arturo Mamani watched the scene unfold below, and saw his brother Mr.

Domingo Mamani shot by military personnel. A short while later, military personnel shot Mr.

41

Arturo Mamani at about 1 1:00 a.m. from a significant distance, through the leg. His son carried

his father, Mr. Arturo Mamani, down the hill, eventually obtaining assistance. His father was

carried to a hospital, where he died.

73. After several hours, the military departed Anat.la and Uni and headed toward La

Paz. As they passed through the village of Ovejuyo near Apafia, personnel in military transports

fired at civilians They fired at a drunken man who feigned death. They also shot and killed the

father of Plaintiff Felicidad Rosa Huanca Quispe, Rani Ramón Huanca Marquez, from a

significant distance as he crawled along the ground to avoid gunfire.

74. On October 15 and 16, 2003, military personnel killed three additional civilians.

On October 17, 2003, the U.S. Embassy issued a public statement withdrawing support for

Defendant Lozada and his government. On that same day, Defendant Lozada resigned the

presidency. Both Defendants, immediately fled to the United States.

75. In November 2004, one year after Defendants left Bolivia, the Trial of

Responsibilities *(Juicio de Responsabilidades)* commenced in Bolivia to determine the criminal

liability of Defendant Lozada, Defendant Sanchez Berzain, and other ministers for the 67 deaths

and over 400 injuries during September and October 2003.

76. While twelve ministers have testified, Defendant Sanchez Berzain and Defendant

Lozada have refused to return to Bolivia to face trial. On June 22, 2005, the Bolivian

government formally requested that the U.S. State Department serve Defendants in connection

with the criminal investigation in Bolivia. On information and belief, the U.S. State Department

has not forwarded this request to either Defendant Lozada or Defendant Sanchez Berzain

16

77. In January 2007, the Supreme Court of Bolivia issued pre-indictments against

Defendant Lozada and Defendant Sanchez Berzain, advancing the criminal process against the

two men and others.

## GENERAL ALLEGATIONS

78. The acts described herein were carried out under actual or apparent authority or

color of law of the government of Bolivia. The acts of extrajudicial killing against Plaintiffs'

Decedents were part of a pattern and practice of systematic or widespread attacks and human

rights violations committed against the civilian population in Bolivia from September to October

2003, for which Defendants bear responsibility.

79. At all relevant times in September and October 2003, Defendant Lozada, as President, was Captain General of the Armed Forces of Bolivia, as designated by Article 97 of the Bolivian Constitution, and Defendant Sanchez Berzain was Minister of Defense of the Republic of Bolivia. As such, Defendants possessed and exercised command and control over the Armed Forces of Bolivia, which includes the Army, Navy and Air Force and, as a reserve or auxiliary force, the police. Defendants' command over such forces included the authority and responsibility to give orders to, set policy for, and manage the affairs of these forces, and to appoint, remove and discipline the personnel of such forces. They also acquiesced in and permitted persons or groups acting in coordination with the Police and Armed Forces or under their control to commit human rights abuses and widespread attacks against civili

80 At all relevant times in September and October 2003, Defendant Lozada Defendant Sanchez Berzain had the actual authority and practical ability to exert control over subordinates in the security forces.

81. At all relevant times in September and October 2003, Defendant Lozada and Defendant Sanchez Berzain met with military leaders, other ministers in the Lozada government to plan widespread attacks involving the use of high-caliber weapons against protesters.

82. At all relevant times in September and October 2003, Defendant Lozada and Defendant Sanchez Berzafn had a duty under customary international law and Bolivian law to

44

ensure the protection of civilians, to prevent violations of international and Bolivian law by

government forces, and to ensure that all persons under their command were trained in, and

complied with, the laws of war, as well as international and Bolivian law, including the

prohibitions against extrajudicial killings and crimes against humanity.

83. At all relevant times in September and October 2003, Defendant Lozada and

Defendant Sanchez Berzain were under a duty to investigate, prevent and punish violations of

international and Bolivian law committed by members of the Armed Forces under his command.

84. The extrajudicial killings described above were part of a pattern and practice of

widespread, systematic attacks against the civilian population of Bolivia.

85. At all relevant times, Defendant Lozada and Defendant Sanchez Berzain knew or

reasonably should have known of the pattern and practice of widespread, systematic attacks

against the civilian population by subordinates under their command, including the abuses

committed against Plaintiffs and Plaintiffs' Decedents.

86. Defendant Lozada and Defendant Sanchez Berzain knew or should have known

that goverment forces had employed targeted, deadly force against Bolivia's civilian population

prior to September and October 200

87. During the events of September and October 2003, images of violence perpetrated

by the government forces were repeatedly shown on the major Bolivian television stations and **in**

45

**18**

the major newspapers. Furtheimore, community and human rights leaders met with Defendant

Sanchez Berzain, Defendant Lozada, and other members of the government to discuss the

violence that was taking place. Nevertheless, rather than taking necessary steps to prevent

additional violence, Defendants and the government escalated the attacks against

the civilian population.

88 Defendant Lozada and Defendant Sanchez Berzain failed or refused to take all

necessary measures to investigate and prevent these abuses, or to punish personnel under their

command for committing such abuses.

89. At all times relevant hereto, Defendant Lozada and Defendant Sanchez Berzain

exercised command responsibility over, conspired with, ratified, and/or aided and abetted

subordinates in the Armed Forces or persons or groups acting in coordination with the Armed

Forces or under their control to commit acts of extrajudicial killing, crimes against humanity, and

the other wrongful acts alleged herein, and to cover up these abuses.

90. At all times relevant hereto, Defendant Lozada's and Defendant Sanchez

Berzain's acts and omissions described above, and the acts committed by their subordinates

against the Plaintiffs and Plaintiffs' Decedents, were committed under actual or apparent

authority, or color of law, of the government of Bolivia.

91. At all times relevant hereto, the Armed Forces or persons or groups acting in

coordination with the Armed Forces or under their control were acting as agents of

Defendant

Lozada and Defendant Sanchez Berzain

19

**FIRST CLAIM FOR RELIEF**
*(Extrajudicial Killing)*

92. Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos,

Heman Apaza Cutipa, Juan Patricio Quispe Mamani, Te6filo Baltazar Cerro, Juana Valencia de

Carvajal, Herm6genes Bemabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca

Quispe re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 91

as if fully set forth herein.

93. The murders of Plaintiffs' Decedents Marlene Nancy Rojas Ramos, Lucio Santos

Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia Morales

Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bernabé Roque, Arturo

Mamani Mamani and Raftl Ramón Huanca Marquez constitute extrajudicial killings under

47

customary international law and as defined by the Torture Victim Protection Act, Pub. L. No.

102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

94. Defendants are liable for the acts committed by their subordinates, caused the

extrajudicial killings of said Decedents, and caused Plaintiffs Eloy Rojas Ma ani, Etelvina

Ramos Mamani, Sonia Espejo Villalobos, Hemân Apaza Cutipa, Juan Patricio Quispe Mamani,

Te6filo Baltazar Cerro, Juana Valencia de Carvajal, Herm6genes Bemabé Callizaya, Gonzalo

Mamani Aguilar, and Felicidad Rosa Huanca Quispe to experience severe

mental pain and suffering.

95. The conduct alleged is actionable under the Alien Tort Statute 28 U.S.C. § 1350,

and the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28

§ 1350 note

20

**SECOND CLAIM FOR RELIEF**
*(Crimes Against Humanity)*

96. Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos,

Heman Apaza Cutipa, Juan Patricio Quispe Mamani, Te6filo Baltazar Cerro, Juana

48

Valencia de

Carvajal, He im6genes Bernabé Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca

Quispe re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 91

as if fully set forth herein.

97. The extrajudicial killings of Plaintiffs' Decedents Marlene Nancy Rojas Ramos,

Lucio Santos Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia

Morales Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bernabé Roque,

Arturo Mamani Mamani and Rail Ramón Huanca Marquez described herein were committed as

part of a widespread or systematic attack against a civilian population.

98. The attacks were intended to terrorize the indigenous Aymara population of the

La Paz region.

99. The conduct alleged violates the customary international law norm prohibiting

crimes against humanity and is actionable under the Alien Tort Statute.

## THIRD CLAIM FOR RELIEF
*(Violation of the Rights to Life, Liberty and Security of Person and Freedom of Assembly and Association)*

100. Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos,

Hernan Apaza Cutipa, Juan Patricio Quispe Mamani, Te6filo Balta7nr Cerro, Juana Valencia de

Carvajal, Herni6genes Bernab6 Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca

Quispe allege and incorporate by reference the allegations set forth in paragraphs I through

as if fully set forth herein.

101. The shootings of Plaintiffs' Decedents Marlene Nancy Rojas Ramos, Lucia Santos Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia Morales Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bemabé Roque, Arturo Mamani Mamani and Rani Ramón Huanca Marquez described herein were violations of their rights to life, liberty and security of person, and their rights to association, for which Defendants may be held liable. In addition, the right of Lucio Santos Gandarillas Ayala to assemble peacefully was violated.

102. The wrongful acts described herein violated and deprived Plaintiffs' Decedents of their rights to life, liberty and security of person, to association, and, in the case of Lucia Santos Gandarillas Ayala, to peaceful assembly, in violation of customary international law. This conduct is actionable under the Alien Tort Statute.

103. Defendants are liable for said conduct in that they requested, confirmed, ratified, incited and/or conspired with the Bolivian Armed Forces and Police or persons or groups acting in coordination with the Armed Forces or under their control to bring about these violations.

**FOURTH CLAIM FOR RELIEF**
*(Wrongful Death)*

104. All Plaintiffs allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

105. Defendant Lozada and Defendant Sanchez Berzain tortiously and intentionally ordered military personnel to use deadly force against the unarmed decedents, who posed no threat to Defendants, Bolivian military personnel or others. Defendants' tortious conduct caused the deaths of Marlene Nancy Rojas Ramos, Lucio Santos Gandarillas Ayala, Roxana Apaza Cutipa, Constantino Quispe Mamani, Teodosia Morales Mamani and her unborn child, Marcelino Carvajal Lucero, Jacinto Bemab6 Roque, Arturo Mamani Mamani, and Raid Ram6n Huanca Marquez.

106. Plaintiff Eloy Rojas Mamani is the father and personal representative of decedent Marlene Nancy Rojas Ramos, and Plaintiff Etelvina Ramos Mamani is the mother of decedent Marlene Nancy Rojas Ramos. As a result of the death of their daughter, Mr. and Mrs. Rojas have suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services.

107. Plaintiff Sonia Espejo Villalobos is the wife and personal representative of decedent Lucio Santos Gandarillas Ayala. As a result of the death of her husband, Mrs. Espejo has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which she is dependent.

108. Plaintiff Herndn Apaza Cutipa is the brother and personal representative of decedent Roxana Apaza Cutipa. As a result of the death of his sister, Mr. Apaza has

51

suffered

damages due to mental pain and anguish, medical and funeral expenses, and the loss of future

support and services on which he and his family are dependent.

109. Plaintiff Juan Patricio Quispe Mamani is the brother and personal representative of decedent Constantino Quispe Mamani. As a result of the death of his brother, Mr. Juan Patricio Quispe has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

1 10. Plaintiff Te6filo Baltazar Cerro is the husband and personal representative of decedent Teodosia Morales Mamani. At the time of the shooting, decedent was five months pregnant. As such, Mr. Baltazar is also the father of his unborn child, As a result of the death of

his wife and unborn child, Mr. Baltazar has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services.

11 1. Plaintiff Juana Valencia de Carvajal is the wife and personal representative of decedent Marcelino Carvajal Lucero. As a result of the death of her husband, Mrs. Valencia de Carvajal has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which she is dependent.

112. Plaintiff Herm6genes Bemabé Callizaya is the son and personal representative of decedent Jacinto Bernabé Roque. As a result of the death of his father, Mr. Bemabé Callizaya has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

13. Plaintiff Gonzalo Mamani Aguilar is the son and personal representative of decedent Arturo Mamani Ma ani. As a result of the death of his father, Mr. Mamani Aguilar has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which he and his family are dependent.

14. Plaintiff Felicidad Rosa Huanca Quispe is the daughter and personal representative of decedent Raid Ramón Huanca Marquez. As a result of the death of her father, Ms. Huanca Quispe has suffered damages due to mental pain and anguish, medical and funeral expenses, and the loss of future support and services on which she and her family are dependent.

### i4 H4 TH CLAIM FOR RELIEF
*(Intentional Infliction of Emotional Distress)*

115, Plaintiffs Eloy Rojas Mamani, Etelvina Ramos Mamani, Sonia Espejo Villalobos, Hernin Apaza Cutipa, Juan Patricio Quispe Mamani, Te6filo Baltazar Cerro, Juana Valencia de Carvajal, Herm6genes Bernabe Callizaya, Gonzalo Mamani Aguilar, and Felicidad Rosa Huanca

Quispe allege and incotporate by reference the allegations set forth in paragraphs 1 through 91 as

if fully set forth herein.

116. The acts described herein constitute outrageous conduct against the Decedents. These acts terrorized Decedents' families, including the Plaintiffs.

17. Defendant Lozada and Defendant Sanchez Berzain intended to cause Plaintiffs to suffer emotional distress, or, in the alternative, Defendants or their agents engaged in the conduct with reckless disregard of the high probability of causing Plaintiffs to suffer emotional distress.

18. Plaintiffs suffered severe emotional distress and the outrageous conduct of

Defendants was a cause of the emotional distress suffered by Plaintiffs.

119. Defendant Lozada's and Defendant Sanchez Berzain's or their agents' outrageous conduct constitutes intentional infliction of emotional distress and is actionable under the laws of the State of Florida. Plaintiffs are entitled to compensatory and punitive damages in amounts to be ascertained at trial.

### SIXTH CLAIM FOR RELIEF
*(Negligent Infliction of Emotional Distress)*

120. Plaintiffs Eloy Rojas Mamani and Etelvina Ramos Mamani allege and incorporate by reference the allegations set forth in paragraphs 1 through 91 as if fully set forth herein.

121. At all relevant times, Defendant Lozada and Defendant Sanchez Berzain owed these two Plaintiffs a duty to act with reasonable care, and/or the injury to the Plaintiffs was reasonably foreseeable.

122 At all relevant times, Defendants had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

123. At all relevant times, Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in Plaintiffs' physical and emotional distress.

124. Despite said knowledge, power, and duty, Defendant Lozada and Defendant Sanchez Berzain negligently failed to stop engaging in the conduct described herein or to prevent or to prohibit such conduct or otherwise to protect Plaintiffs, thereby breaching their duty to them. To the extent that said negligent conduct was perpetrated by certain agents of the

government, the Defendants confirmed and ratified said conduct with the knowledge that

Plaintiffs' emotional and physical distress would thereby increase and with a wanton and

reckless disregard for the deleterious consequences to Plaintiffs.

125. Plaintiffs observed the circumstances of the extrajudicial killing of a

family member.

126. As a direct and legal result of Defendant Lozada's and Defendant Sanchez

Berzain's wrongful acts, Plaintiffs have suffered and will continue to suffer significant physical

injury, pain and suffering and extreme and severe mental anguish and emotional distress.

127. Defendant Lozada's and Defendant Sanchez Berzain's conduct constitutes the

negligent infliction of emotional distress and is actionable under the laws of the State of Florida.

Plaintiffs are entitled to compensatory and punitive damages in amounts to be ascertained at trial.

## SEVENTH CLAIM FOR RELIEF
*(Negligence)*

128. All Plaintiffs allege and incorporate by reference the allegations set forth in

paragraphs 1 through 91 as if fully set forth herein.

129. Defendant Lozada and Defendant Sanchez Berzain failed to use ordinary or

reasonable care to avoid injury to Plaintiffs. Defendants' negligence was a cause of injury,

damage, loss or **harm** to Plaintiffs.

130. As a result of these acts, Plaintiffs suffered harm including, but not limited to,

physical injury, pain and suffering, and severe emotional distress. Defendants' conduct

constitutes negligence and is actionable under the laws of the State of Florida. Plaintiffs are

entitled to compensatory and punitive damages in amounts to be ascertained at trial.

## PRAYER FOR RELIEF

131. WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a) For compensatory damages according to proof;

(b) For punitive and exemplary damages according to proof;

(c) For reasonable attorneys' fees and costs of suit, according to proof; and

(d) For such other and further relief as the court may deem just and proper.

132. A jury trial is demanded on all issues.

Dated: May 16, 2008
Miami, Florida

Respectfully submitted,


names and signatures ojiittedi